## McMURRAY v. MORAN.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF NEVADA.

No. 193.   Argued January 30, 1890. — Decided March 3, 1890.

A railroad company made a mortgage to secure an issue of 3000 bonds of $1000 each. It contracted with a contractor for the construction of 31 miles of its road and as part consideration therefor agreed to give him 310 of these bonds. Before any further issues were made it agreed with a banking house in New York, as a part consideration for their acquiring these bonds, that it would only issue bonds to the extent of $10,000 a mile on its constructed road, and on the faith of this the New York house bought and paid for the bonds, and the 31 miles of road were constructed. Subsequently, and without constructing any additional miles, it issued 147 more bonds which were mostly used in the settlement of debts to parties who had notice of the agreement with the New York house. Default having been made in payment of interest a bill in equity was filed to foreclose the mortgage; *Held,*

(1) That as to all persons acquiring any part of the 147 bonds with notice of the agreement with the New York house, the 310 bonds held by the latter were entitled to priority;

(2) That holders who took them without notice of it, whether taking originally from the company, or by purchase from one who took with knowledge, were entitled to share with the New York house in the distribution.

THE "Nevada and Oregon Railroad Company," a corporation of the State of Nevada, by its mortgage or deed of trust, executed April 25, 1881, bargained, sold and conveyed to the Union Trust Company of New York all of the property, franchises and estate, real and personal, then existing and to be acquired, including its line of road constructed or to be con-

structed or completed, to secure the payment of three thousand bonds of one thousand dollars each, to be issued by the mortgagor, and made payable on the first day of June, 1930, at the city of New York, with interest, semi-annually, at the rate of eight per cent per annum. Each bond contained an agreement that if there was a continuous default for six months in the payment of interest, the principal and all arrearages of interest thereon should, at the option of the holder, become immediately due and payable.

Of the three thousand bonds authorized to be executed by the railroad company, only six hundred were issued and certified by the trustee. The appellees, Moran Brothers, became the holders for value of 310 of the bonds so certified, paying therefor $248,000. In respect to those bonds, there was such default in meeting the interest thereon that appellees became entitled to declare the principal due and payable. And having so declared, the Union Trust Company brought suit in the court below for the foreclosure of the mortgage or deed of trust, the sale of the mortgaged property, and the application of the proceeds of sale in payment of the bonds held by Moran Brothers, and of such other bonds as were entitled to share in the proceeds.

The present suit was brought by Moran Brothers against the appellants as the holders of 147 of the 600 bonds certified by the trustees. It proceeds upon the theory that as between the appellees holding the 310 bonds first issued, and the appellants holding the 147 subsequently issued, the former were entitled to priority in the distribution of the proceeds of the sale of the mortgaged property.

It appears from the evidence that "*The* Nevada and Oregon Railroad Company," a Nevada corporation, entered into a written contract, of date August 26, 1880, with one Thomas Moore, for the construction by him of certain divisions of its road, whose aggregate length was one hundred and eighty-five miles. A part of the consideration for Moore's undertaking this work was the representation of the company, embodied in the contract, that "fifty-year eight per cent first-mortgage bonds, to the extent only of ten thousand dollars per mile, and capital

stock to the extent only of twenty thousand dollars per mile for the first one-hundred and eighty-five miles will be issued, making a total of eighteen-hundred and fifty thousand dollars in first-mortgage bonds, and thirty-seven hundred thousand dollars, par value in stock, upon the entire one hundred and eighty-five miles." The contract further provided for the payment to Moore of $100,000 in lawful money, $310,000 in first-mortgage bonds, and $450,000 in the stock of the railroad company, at par, for the Reno division as far as Beckwith Pass. The contractor was to have all the first-mortgage bonds as the work of construction progressed.

This contract was supplemented by another one, executed December 4, 1880, whereby the time and order of performance as well as of payments were changed. It provided that tho Reno division, from Reno to Beckwith Pass, should be first constructed; that "upon the shipment of 1000 tons of rails and splices the company should pay to the contractor $200,000 in cash, and upon arrival of same at Reno $150,000 in first-mortgage bonds and $300,000 in stock, and upon shipment of balance of rails for the present work $160,000 in first-mortgage bonds and $150,000 in stock;" that "the company shall deposit with the trustee in New York, on or before January 10, 1881, $10,000 in cash, and the $450,000 in stock, and, on or before January 25, 1881, the $310,000 in the first-mortgage bonds;" that this contract should not be "construed as abating or impairing any portion of the contract of August 26, 1880;" and that "the entire stock to be issued upon the line from Reno to the temporary terminus as herein stated [Beckwith Pass] shall be limited to $600,000, without reference to any excess in distance over thirty miles, and the first-mortgage bonds upon the same to $310,000."

A separate contract was made on the same day with reference to the construction of the road from Beckwith Pass to the Oregon line.

The company having failed to make payments to Moore, as it had agreed to do, on account of work done on the Reno division, another contract was made February 1, 1881, by which the company stipulated to deliver to the contractor the

$450,000 of stock and the $310,000 first-mortgage bonds as soon as the certificates and bonds could be engrossed and signed. It was provided that this contract should not impair the contracts previously made between the parties.

On the 25th of April, 1881, the "Nevada and Oregon Railroad Company," the company first above named, was organized. It was the successor, and acquired all the rights, franchises, and property of "*The* Nevada and Oregon Railroad Company" of 1880, and assumed to meet all the contract obligations, and to pay all the debts of the old company. The mortgage, heretofore referred to, of April 25, 1881, was executed by the new company.

By contract of date April 26, 1881, the new company adopted, confirmed, and renewed Moore's contract with the old company, and, subsequently, May 24, 1881, the contract for the construction of the road from Beckwith Pass to the Oregon line was extended one year.

Before the last two dates, namely, on March 23, 1881, the appellees, Moran Bros. and Moore, entered into a contract, by which the former agreed to pay the latter the sum of $248,-000, in specified instalments, upon completion, within certain periods named, of five, ten, twenty-one, twenty-six and thirty-one miles of Reno division against the delivery of the first-mortgage eight per cent bonds of the "Nevada and Oregon Railroad Company." By that contract Moran Bros. became entitled to receive the bonds on instalments, as the above number of miles were constructed.

Subsequent transactions between the parties are so clearly and succinctly stated in the opinion delivered in this cause by Judge Sabin, 20 Fed. Rep. 80, that the following extract is made from it:

"Moore went on under these various contracts and graded 32 miles on the first section north from Reno and commenced grading on the 170 miles running north from Beckwith Pass. He also laid about 17 miles of track from Reno northerly, and provided certain rolling stock and other materials. Moore became embarrassed, and on about November 16, 1881, abandoned his contracts and left the State. From that time forward

the company assumed the management of the road and conducted its future operations as best it could. The company was in a very embarrassed condition. It was largely in debt and without money or resources of any kind to meet its liabilities. It had attempted to build and equip a railroad without first having provided any adequate means for so doing.

" On the twenty-fifth of March, 1882, Moore, as party of the first part, the railroad company, defendant, of the second part, D. W. Balch, H. J. McMurray, A. H. Manning, W. F. Berry and C. A. Bragg, of the third part, and Alvin Burt, as trustee, of the fourth part, entered into an agreement, the object of which was to adjust, as therein provided, the then unsettled business matters between Moore and the railroad company. This contract recognizes the fact that the railroad company had issued to Moore these 310 first-mortgage bonds; that he had negotiated them with Moran Bros., complainants in the second above-entitled suit; that he had been paid for 210 of said bonds by Moran Bros. and that they held the remaining of said bonds subject to contract with Moore, to be paid for as the road was completed. By this contract Moore surrendered his rights in these bonds for the benefit of the railroad company, which subsequently drew the money due upon them. Section 11 of this contract is as follows:

" ' The parties of the second and third part hereby covenant and agree for themselves and the other stockholders, and for the creditors of the party of the first part as follows, viz. : . . . (*b*) That no second mortgage shall be made, issued, or recorded upon said railroad or any portion thereof.

" 'That the issue of first-mortgage bonds thereon shall be limited to $10,000 per mile of completed road, or such an amount that the annual interest charge thereon shall not exceed $800 per mile of completed road, and also that the issue of capital stock of said company shall be limited to $20,000 per mile of said railroad.'

"Pursuant to this contract, on the twenty-sixth of April following, Moore and Moran Bros. join in a communication to Balch, as president of said railroad company, informing him of the terms upon which he can, as the road is completed, draw

upon complainants for $75,000, the balance due upon these 100 bonds. These funds were so drawn and with them the road was completed the 31 miles. It should be noted that this contract of March 25, 1882, was entered into by Balch as president of, and on behalf of, said railroad company, pursuant to a resolution of the board of directors of said company adopted January 13, 1882, prior to his departure from Reno to New York for the purpose of endeavoring to effect a settlement of the business of the com pany. And this contract, if not formally ratified by the directors of the company by resolution adopted to that effect, was actually ratified by the company by its acting upon it, carrying out to some extent, at least, its provisions, and accepting the benefits arising therefrom, and especially in drawing and using the balance due upon the 100 bonds paid by Moran Bros. after its execution. Now, all of these various contracts conclusively show this; that this railroad company, defendant, and its predecessor had repeatedly contracted with Moore and promised and held out to the public that upon no part of the line of its road should there be issued more than $10,000 in first-mortgage bonds for each mile of completed road. It was upon this condition and agreement that Moran Bros. purchased these bonds. Charles Moran, one of the complainants, testifies that the railroad company issued its circulars to that effect; that he saw them; that this limitation was the condition in the purchase of the bonds; that they would not have advanced $11,000 per mile upon the road. He is supported in this by the testimony of Moore, Fowler and Balch, and by every contract in evidence executed either by the railroad company, defendant, or by its predecessor, and subsequently ratified by the Nevada and Oregon Railroad Company; and this testimony is wholly uncontradicted."

The decree below was accompanied with a finding of facts. Among the facts so found were the following:

That before and at the time the 310 bonds were sold the railroad company, in consideration of their purchase, obligated itself in writing that it would not issue or sell any more than ten of said bonds, or $10,000 worth, for each mile of completed road, and no more than 310 for or upon the Reno division, the

defendants and each of them having notice of such agreement;

That while these agreements were in force, and after Moran Bros. had purchased and paid for the 310 bonds now held by them, the company, by and through its then officers and trustees, defendant Balch, trustee and president; King, trustee and secretary; Bragg, Manning and Berry, trustees; McMurray, stockholder; and Deal and Webster, attorneys, issued and advised, caused and procured to be issued, the bonds mentioned in the answer, 147 in number, the defendants and each of them well knowing at the time the terms and conditions of the contracts limiting the issue of bonds, and that complainants had purchased for value the 310 bonds mentioned in the bill of complaint;

That the 147 bonds, and each of them, were procured from the Union Trust Company of New York by defendant Balch, under and in pursuance of a resolution of the board of trustees of the railroad company, adopted by Balch, Bragg, Manning, Berry and King, acting as such board, and for the purpose expressed in the resolution, and represented to the Union Trust Company, of negotiating them for value, and after said bonds were so procured the board delivered them to the original holders thereof without payment therefor of any sum of money whatever;

That, except the 10 bonds issued to the defendants Webster and Deal, the remaining 137 of the 147 bonds were delivered for and in consideration of preëxisting debts, and principally for debts owing by Moore and not debts owing by the company, and in large part for claims that Balch, McMurray, Manning, Berry and Bragg had assumed and agreed to pay; the bonds issued to Webster and Deal having been delivered in consideration of professional legal services to be rendered by them as solicitors for the defendants, and not delivered until after this suit was commenced; and,

That the defendants, who in the answer are alleged to hold a portion of the 147 bonds, and each of them, received such bonds and hold the same as security for debts which existed at and before the time the bonds were acquired by them, and

none of such persons are *bona fide* purchasers of said bonds for value.

Upon this state of facts it was decreed that the complainants were entitled to have the amount of their bonds, principal and interest, paid out of the proceeds of the mortgaged premises, and that none of the defendants were entitled to participate in or share such proceeds until after the payment in full of the principal and interest of the 310 bonds, nor unless there should be a surplus remaining; and if there should be such surplus, then the defendants were entitled to participate in the distribution, each in proportion to the amount of the bonds held by him.

*Mr. Horatio C. King* for appellants. *Mr. W. E. F. Deal* was on their brief.

*Mr. Wheeler H. Peckham.* for appellees.

Mr. Justice Harlan, after stating the above facts, delivered the opinion of the court.

It appears satisfactorily from the evidence that when appellees purchased the 310 bonds from Moore, the latter had contracts with the railroad company, by which it was restricted in issuing bonds to $10,000, par value, for each mile of completed road. It was that feature of the several contracts between the company and Moore that gave value, in the commercial world, to the bonds delivered to him. And the benefit of that restriction upon the issuing of bonds necessarily passed to those who purchased them from Moore. The issuing of bonds in excess of those delivered to Moore, and by him sold, to Moran Bros., was in palpable violation of the company's agreement with him; for, as is conceded, the 310 bonds, held by appellees, represented, on the above basis, all of the completed road. No one receiving the bonds thus improperly issued, who had notice of the restriction which the company, by the contracts with Moore, imposed upon its authority, could be deemed a *bona fide* holder for value. The circum-

stances under which the 147 bonds were obtained by the railroad company from the trustee, the Union Trust Company, are stated with substantial accuracy, in the finding of facts made by the court below. Those who procured those bonds to be issued by the railroad company had knowledge of the want of authority in the company to put them on the market to the prejudice of the rights of the appellees as the holders of the 310 bonds. They were used in payment of the company's debts and obligations and in discharge of obligations assumed by some of its officers. The purpose for which they were issued and used, however meritorious in itself, as between the company and those who originally took them, cannot affect the rights of the appellees arising under the company's contracts with Moore, as the original owner of the 310 bonds.

We do not mean to say that the 147 bonds and each of them are absolutely void for every purpose and by whomsoever held. If the present holders paid value for them without actual notice of the restriction imposed by the company upon its authority to issue them, they would be deemed *bona fidé* holders for value, unaffected by the agreements between Moore and the railroad company. And they would be deemed holders for value, even if they took the bonds in payment of, or as security for, the company's preëxisting debts. *Railroad Co.* v. *National Bank*, 102 U. S. 14.

The mortgage of 1881 does not contain any provision that gives priority to some of the holders of the bonds secured by it over other bonds of the same issue. If it did, all holders of the bonds so secured would be bound to take notice of such provisions; the mortgage having been duly recorded in Nevada. Nor is notice of the rights secured to Moore, as the holder of the 310 bonds, to be imputed to the defendants because the contracts between him and the company, or some of them, were put upon record. We do not understand that, by the law of Nevada, such instruments were required to be recorded, or that the record of them carries with it notice to all the world of their contents. Gen. Stat. Nev. 1883, c. 18, §§ 2571, 2593. The question, therefore, is one of actual notice

upon the part of the defendants when they took the bonds held by them respectively, of the limitation upon the company's authority to issue bonds in excess of the 310. We thus limit the inquiry as to notice, because it is clear that the defendants must have known when they took the bonds that the 310 had been previously issued, and that that amount more than represented completed road on the basis of $10,000 a mile.

Upon a close scrutiny of the evidence we are of opinion that the decree below is correct as to the 56 bonds held by McMurray, the 28 bonds held by the First National Bank of Reno or by Bender for Manning & Berry, and the fraction of a bond held by Bender for the last-named firm. They were received by McMurray and Manning & Berry, respectively, with actual notice, derived from their relations with the railroad company, of its agreement not to issue on the Reno division more than 310 bonds, or $10,000 of bonds for each mile of completed road, and with knowledge, when they took the bonds, that the number thus limited had been previously issued to the contractor Moore. In respect to the 13 bonds held by Wright, the like number held by Watkins, and the five bonds held by Schooling, the evidence shows that the present holders took them for value from the first holders, without notice as to the restriction which the company, by its agreements with Moore, had imposed upon its authority to issue bonds on the Reno division. They were entitled to share in the proceeds of the sale of the mortgaged property, in proportion to the amount of bonds held by them respectively, and upon terms of equality with Moran Bros.

As to the remaining bonds, the appeal must be dismissed, because the amount, at par value, held by each of the respective appellants owning them, is not sufficient to give this court jurisdiction to review the decree below, so far as it affects them. No one of those claims, principal and interest, exceeded at the time of the decree below, the sum of five thousand dollars. Each claim is distinct and separate from the claims of all other appellants; and the right of each claimant to be regarded as a *bona fide* holder for value depends upon the

special circumstances under which he took the bonds now held by him. *Gibson* v. *Shufeldt*, 122 U. S. 27 ; *Jewell* v. *Knight*, 123 U. S. 426, 432.

> *The decree below as to H. J. McMurray, A. H. Manning and W. F. Berry, partners as Manning & Berry ; Charles T. Bender, trustee for Manning and Berry, and the First National Bank of Reno as trustee for Manning & Berry, must be affirmed ; and reversed as to the appellants William Wright; A. A. Watkins and Jerry Schooling, and the cause, as to those parties, must be remanded for further proceedings consistent with this opinion. The appeal by all the other appellants must be dismissed. The appellants Wright, Watkins and Schooling will recover against the appellees their costs in this court. It is so ordered.*