JAMES J. BELDEN, Appellant, *v.* STEVENSON BURKE et al., Respondents.

*Covenant in a trust mortgage for the benefit of all holders of the bonds — the right to its enforcement passes with the bonds — it cannot be waived by acts of the first holders of the bonds as against their successors — the bondholders can bring suit for its enforcement where the trustee refuses to do so — rules for construction of contracts.*

The defendant Burke and others, interested in two coal companies owning coal lands in the Hocking valley, formed a railroad company for the purpose of constructing a railway in the Hocking valley, in order to reach and develop the coal lands in which they were thus interested. Prior to the organization of such railroad company there existed three railways forming a continuous line from Toledo through Columbus and Hocking valley to the Ohio river. The proposed new line was to run parallel to and be a competitor of these existing lines, of each of which one Greene was president. On hearing of the proposed new line, Greene arranged with the defendant Burke that the latter and his associates should purchase the stock of the three existing companies.

Subsequently Burke and his associates agreed among themselves to consolidate the existing railroads into one ; to cause it to acquire the coal lands then held by the two coal companies in which Burke and his associates were interested ; to cause it to issue $8,000,000 of bonds, which should be used to pay for the coal lands, or for the stock of the companies owning them, and to convert the stock of the three existing railroad companies into stock of the new company. In consequence of this arrangement the plan for a new railroad was abandoned.

Subsequently, and prior to the 1st of October, 1881, the defendant Burke and his associates and Greene combined and confederated together to make a profit out of the new company, and carried out their plan in the following manner :

They borrowed, through the defendants Winslow, Lanier & Co., $6,000,000, from the defendants Drexel, Morgan & Co , and with it acquired all of the stock of the three existing railways, except seven shares, delivering the stock as pur· chased as collateral security for the loan. They agreed with Winslow, Lanier & Co that they would cause the new company to issue its bonds, and that $8,000,000 of them should be delivered to Winslow, Lanier & Co. as additional security for the loan, they agreeing to deliver the bonds at par to such persons as Burke and his associates should dispose of them to ; that Burke and his associates should organize a coal company if the railway company could not legally become the owner of coal lands, and cause the 10,000 acres of coal lands con·· trolled by them to be conveyed to such company ; that such company should further secure the bonds to be issued by the consolidated railway company by a mortgage of these lands, and that the title to the $8,000,000 of bonds should be vested in Burke and his associates individually, so·that they could be properly used as collateral to the loan.

They consolidated the three railroads into one known as the Columbus, Hocking Valley and Toledo Railway Company, one of the defendants to this suit, and made Greene president and Burke vice-president. The board of directors, officers and stockholders of the company were all associated and agreed with Burke and Greene in the execution of these plans.

They formed a coal company known as the Hocking Coal and Railway Company, and subscribed for all the stock thereof among themselves, and to this company conveyed 10,000 acres of land the title to which was in the two coal companies above mentioned, controlled by Burke and his associates, at a price largely in excess of its market value or cost. All the stock of this company was transferred to Greene as president of the railway, and a certificate therefor was issued to him. The directors and stockholders of this company unanimously resolved to join in a mortgage to be made by the consolidated railway company for the purpose of securing its bonds, which, in October, 1881, was duly executed by the consolidated railway company and the coal company to the Central Trust Company of New York, which accepted the trust it contained. Prior to the execution of the mortgage, certain resolutions authorizing it and reciting the purposes for which the bonds should be used, were passed by the directors of the consolidated railway company, among them the following, which the mortgage recited, providing that $6,500,000 of said bonds should be reserved for the purpose of being exchanged for bonds of the constituent companies and "that the remaining 8,000 bonds, amounting to $8,000,000, shall be sold and disposed of by the president and executive committee, and the proceeds thereof shall be applied for the purposes of double-tracking, equipping and increasing the transportation facilities of and improving the company's railway, and in pur· chasing such real estate and other property as in the judgment of its board of directors or of the president and executive committee, the interests of said company require."

The mortgage, which was duly recorded, contained the usual provisions and covenants which ran to the mortgagee as trustee for the "benefit and security of the several persons and their successors, administrators, executors or assigns,

who shall * * * hereafter become the owners and holders of any of the bonds to the amount of $14,500,000 intended to be hereby secured and to be made and issued as 'in said mortgage provided.'" The bonds were not to become operative until a certificate upon them was signed by the Central Trust Company of New York, as trustee.

It was also provided in the mortgage that $8,000,000 of bonds should be delivered to the president and vice-president (Greene and Burke) or either of them, to be used by them in accordance with the provisions of the mortgage, and that the trustee should not be answerable for the use made of them, and subsequently $8,000,000 of the bonds were duly certified by the trustee, and delivered to Burke and Greene and disposed of by them.

At the time of the execution of the mortgage and of the certification and delivery by the trustee of the $8,000,000 of bonds, it was not the intention of the railway company (consisting of Burke and his associates) that the $8,000,000 of bonds should be used for the purpose specified in the resolution embodied in the mortgage, but, on the contrary, it was intended that they should be used for the personal ends of Burke and his associates, as agreed upon prior to the formation of the company.

Arrangements were made by Burke and his associates for the sale of the bonds with Winslow, Lanier & Co., having for their object the payment of the indebtedness incurred in the purchase of the stock of the three old companies, the payment of the debt of the coal company for the 10,000 acres of land, etc.

On August 14, 1882, by resolution passed by the directors of the consolidated railway company, the president of that company was authorized to purchase the whole of the stock of the Hocking Coal and Railway Company for the price of $8,000,000, and to pay therefor with the consolidated bonds of the consolidated railway company at par, and that the stock of the company be put in the name of the president as trustee for the railway company. This action was unanimously confirmed by the stockholders.

At this time, in fact, Burke and his associates owned all the stock of the railway company, and prior to the adoption of this resolution the railway company had purchased from Burke and his associates, who were the owners thereof, the 15,000 shares of the coal company's stock for the bonds, and the bonds had been actually delivered in payment therefor, of which transaction all of the directors and stockholders of the railway company had, and had always had, knowledge. The stock of the coal company had also been transferred to the president of the railway, as trustee for the company, soon after the formation of the latter company.

The $8,000,000 of bonds were delivered to Burke and his associates; of these bonds 6,411 were used in paying their loan and in paying Winslow, Lanier & Co for their services, 853 were applied to their personal use, and 736 were used in paying for the coal lands which they had conveyed to the Hocking Coal and Railway Company.

In 1887 the railway company, having passed into other hands, brought suit in Ohio against Burke and certain of his associates, setting up substantially all

the facts above set forth, and asking for judgment against the defendants for the sum due the railway company by reason of the misappropriation of the bonds. This suit was referred to arbitrators, and was decided in September, 1888, in favor of the defendants, and judgment was entered accordingly.

The present action was thereafter brought by the owner of fifty of these $8,000,000 of bonds, bought by him for value and in good faith before maturity, and in the open market, with the knowledge that the entire issue was sold, and with knowledge of the bringing of the Ohio suit and of the object for which it was brought.

When the plaintiff bought the fifty bonds he did not rely upon any special provision of the mortgage, but he knew that there was a mortgage and that the bonds were secured thereby, and relied upon that security. He requested the Central Trust Company of New York, as trustee under the mortgage, to bring this suit for the purpose of recovering the amount realized for the bonds, and diverted by Burke and his associates. The company refused to do so, and subsequently this suit was begun by him. It was tried at Special Term and decided in favor of the defendants.

*Held,* that the covenants in the mortgage took effect as soon as the trustee certified and delivered any of the bonds to the president and vice-president of the company;

That the covenants were for the benefit of all future holders of the bonds, and the right to have them enforced and to receive the benefit of them passed with the bonds to such holders, free and clear of all equities that might exist as against prior holders;

That the fact that the first holders of the bonds consented to the misappropriation of the funds, and thus lost the right to enforce the covenants, did not affect the right of subsequent holders to enforce them;

That as long as any of the bonds were outstanding unmatured, it was the right and duty of the trustee to enforce the provisions of the security for the benefit of the bondholders;

That as between railroad mortgage bondholders and persons acquiring liens on the mortgaged property subsequent to the recording of the mortgage, the rights of the *bona fide* holders of the bonds were to be determined as if they had been acquired at the date of the recording of the mortgage securing them, and the same rule applied as against the railroad company itself, and as against those chargeable in equity with its obligations;

That a court of equity would go behind the corporate veil, hiding from view the real transaction and the parties who were executing it, and compel the latter to turn over the proceeds of the bonds to the railway company, and require it to apply them in accordance with the terms of the covenants,

That the fraud perpetrated to the injury of the trustee and bondholders, not remediable in a court of law, gave to the court the power to place the diverted fund where it of right fully belonged.

That the trustee was entitled to maintain this action, but having refused to do so on the request of the plaintiff, the latter had a right to bring it for the benefit of himself and the other bondholders;

That so far as the findings disclosed the defendants Winslow, Lanier & Co and Drexel, Morgan & Co. had not acted fraudulently, and were not liable to the bondholders;

That the judgment should be reversed and a new trial be granted.

Where a contract permits of two constructions the legal rather than the illegal will be deemed the true construction.

Where the words of a promise may have been used in an enlarged or restricted sense, they will be generally construed in the sense most beneficial to the promisee.

Where words of general description are associated with words of particular description, the general words, in the absence of anything clearly manifesting a contrary intent, will be limited so as to be *ejusdem generis* with the particular words.

APPEAL by the plaintiff, James J. Belden, from a judgment of the Supreme Court in favor of the defendants, entered in the office of the clerk of the city and county of New York on the 10th day of January, 1893, dismissing the plaintiff's complaint, and from an order entered in the said clerk's office on the 29th day of December, 1892.

In June, 1881, certain persons, who were interested in two coal companies, known respectively as the Continental Coal Company and the Snowfork and Cleveland Coal Company, which owned lands in the Hocking valley in the State of Ohio, conceived, in good faith and without any ulterior object or motive, the project of constructing a railroad from Columbus, Ohio, to and through their coal lands in the Hocking valley, for the purpose of developing the same and of bringing their coal to market. In furtherance of this project, they caused surveys to be made and organized a corporation under the laws of Ohio for the purpose of constructing, owning and operating a railroad from the city of Columbus though the Hocking valley to the Ohio river, with branches to their several furnaces and coal mines, with an authorized capital of $6,000,000.

The incorporators of the said railroad company were Stevenson Burke, Charles Hickox, Chauncey H. Andrews, William J. McKinnie, who are named as defendants in this action, and Henry B. Payne, Jeptha H. Wade and Sylvester T. Everett, who are strangers to this litigation.

For a considerable time prior to the incorporation of the said railroad company, there had existed in Ohio three other railroad companies, known respectively as the Columbus and Toledo Railroad Company, the Columbus and Hocking Valley Railway Company and the Ohio and West Virginia Railway Company, which had long

been operated as one company, and which together formed a continuous line from Toledo through Columbus and the Hocking valley to the Ohio river. These three roads are hereinafter termed, for convenience, "the constituent companies." They were dependent upon coal freights for their business.

The proposed line of the newly-incorporated railroad company was parallel to the central part of that of the constituent companies, and, if it had been built, would have been a competitor and rival of them for the coal freights of the Hocking valley upon which they depended.

Milbury M. Greene had long been the president of each of the constituent companies. The construction of the proposed new railroad would have been a serious menace and detriment to his companies. On June 8, 1881, the said Greene, having learned of the organization of the rival company, sought and obtained an interview with the defendant Stevenson Burke, which resulted in an offer by Burke, on his own responsibility, to purchase the whole or any part of the stock of the constituent companies, not less than a majority of each, at stated prices, which, in each case, was greater than the market value of the same. This offer, having been accepted by a considerable number of the stockholders of the constituent companies, was communicated by Burke to some of the persons who were interested with him in the said coal lands and the proposed rival railroad, and, after examination, they joined with him in the said offer to purchase the stock of the constituent companies. Accordingly, on the 27th of June, 1881, the defendant Stevenson Burke, Charles McKinnie, W. J. McKinnie, Chauncey H. Andrews and Wallace C. Andrews entered into an agreement that as soon as they should acquire the stock of the constituent companies they would consolidate the companies into one railroad company, and that the said railroad company should acquire the coal lands held by the said coal companies and, in order to enable it so to do, that a mortgage should be executed by the proposed consolidated railway company to secure $8,000,000 of five per cent bonds, which should be used to pay for the said coal lands, or for the stock of the coal companies; and that they would convert the stock of the three constituent companies into a consolidated stock of the consolidated railway company to the amount of $10,000,000.

In consequence of this arrangement, the proposed rival railroad was abandoned, and all of the said coal lands were conveyed to a corporation known as the Hocking Coal and Railroad Company, as hereinafter described.

Thereafter, and prior to the 1st day of October, 1881, said Burke and associates, and said Milbury M. Greene, combined together to make money and gains for themselves, by the means and in the manner following:

*First.* By Burke and associates purchasing a majority, and, as nearly as possible, all of the capital stock of said divisional companies, and by procuring bankers to advance to Burke and associates the money for such purchase.

*Second.* By Burke and associates also obtaining the ownership or control of 10,000 acres of coal lands having a then present market value, as said Burke and associates and said Greene had good reason to know, of not more than $150 per acre, and lying in the neighborhood of the line of railway of said divisional companies, which coal lands, as well as such line of railway, were to be covered by the mortgage hereinafter mentioned.

*Third.* By consolidating said divisional companies into one company, and making said Greene president thereof, and by causing such consolidated company to issue $14,500,000 of bonds, of which $6,500,000 were to be reserved to take up and provide for bonds then outstanding of said divisional companies, and the remainder, $8,000,000, thereof were to be used by said Burke and associates to pay back the money advanced for the purchase of said stock, and to pay for said 10,000 acres of coal lands, and to pay to the bankers making such advance a compensation for their services to Burke and associates, and to pay said Greene a compensation for his services to Burke and associates, and to benefit Burke and associates individually in other ways.

*Fourth.* By causing said consolidated company to mortgage all its property to the Central Trust Company of New York, as trustee, to secure $14,500,000 of bonds by a mortgage, containing the usual covenants, conditions and stipulations of first-class mortgages executed under the laws of Ohio.

*Fifth.* By concealing, and causing said consolidated company, at

the time of the execution and delivery of such mortgage, and afterwards to conceal, the use intended, as aforesaid, to be made of said $8,000,000 of bonds, and by causing said consolidated company in said mortgage to represent that it was its intention and purpose to apply said $8,000,000 of bonds and their proceeds in the way specified and limited in the corporate resolution to be set forth in the said mortgage (these being such as would improve the mortgage security), and by causing said consolidated company to covenant in said mortgage with the trustee thereof, for the use and benefit of all persons who should become owners and holders of the bonds secured thereby, that it would do so, and so enhancing the public credit and currency of the bonds.

That such scheme (to which the defendant the Columbus, Hocking Valley and Toledo Railway Company, after its formation, became a willing party) was carried out by said Burke and associates and said Greene, substantially as hereinafter set forth.

The defendants Winslow, Lanier & Co. were then bankers in the city of New York, as also were Drexel, Morgan & Co. On July 1, 1881, these two firms of bankers and Burke and associates entered into an agreement, in writing, to the following effect: Winslow, Lanier & Co. agreed to lend Burke and associates $6,000,000 at six per cent discount upon their promissory notes. The money so borrowed was to be paid to a Columbus, Ohio, bank for the stocks of the constituent companies, at specified prices per share. All the said stocks so paid for from time to time were to be transferred to the said Greene, and by him forwarded from time to time to Winslow, Lanier & Co., to be held as collateral security for the said loan of $6,000,000. As further security for the said loan Burke and associates were to deliver $1,600,000 of the stock of one of the coal companies, and the equivalent of $1,500,000 of the stock of the other coal company.

It was further agreed between the parties that the constituent companies should be consolidated into one company and the shares of the constituent companies be exchanged for the shares of the consolidated company, and that the new stock should be held by Winslow, Lanier & Co. as collateral security in place of the old stock.

Burke and associates further agreed to cause the proposed con-

solidated railroad company to issue a consolidated mortgage covering its property and also the coal lands belonging to the two coal companies, amounting to 10,000 acres; with this mortgage to secure bonds for $14,500,000; that $6,500,000 of them should be used to pay off and cancel outstanding bonds of the constituent companies, and that $8,000,000 of them should be delivered to Winslow, Lanier & Co. as additional security for said loan, which bonds Winslow, Lanier & Co. agreed to deliver at par to such persons as Burke and associates might dispose of the same to. When the loan to Burke and associates should be paid the said securities were to be returned to them.

It was further agreed between the parties that if the consolidated railway company could not legally become the owner of the said coal lands, so as to embrace them in its mortgage, then Burke and associates should organize a coal company, cause the 10,000 acres of coal lands to be conveyed to it, and cause the coal company to secure the bonds of the consolidated railroad company by the said coal lands. It was agreed that the title to the said $8,000,000 of bonds must be vested in Burke and associates, so that they would be proper collateral to secure the said loan.

Winslow, Lanier & Co. thereafter arranged with Drexel, Morgan & Co. for the discount of twenty-four notes of Burke and associates, aggregating $6,000,000, and they devoted the proceeds of the said loan to paying for the stock of the constituent companies, which Burke and associates were thus enabled to purchase. All the shares of the constituent companies (except seven shares of one of them) were thus purchased and paid for, and were deposited through the agency of the said Greene and of Winslow, Lanier & Co. with Drexel, Morgan & Co. as security for the said loan.

On the 19th day of July, 1881, Burke and associates caused a consolidation agreement to be entered into between the constituent companies, which was on the following day adopted by the stockholders of each of them, whereby the defendant the Columbus, Hocking Valley and Toledo Railway Company, herein called the consolidated company, was created; the said Milbury M. Greene was made the president of the consolidated company, and the defendant Stevenson Burke its vice-president and they continued so to be throughout the time covered by the transactions complained of.

The original board of directors of the consolidated company were the following : M. M. Greene, Stevenson Burke, Charles G. Hickox, Chauncey H. Andrews, W. J. McKinnie and John W. Ellis.

The executive committee were the said Greene, Burke, McKinnie and Hickox.

On September 28, 1881, the directors and stockholders of the consolidated company unanimously passed resolutions authorizing the issue of the bonds in question, which resolutions are recited in the mortgage.

On September 13, 1881, Burke and associates caused to be incorporated a company, entitled the Hocking Coal and Railway Company, for the purpose of acquiring land and mining coal, and with power to construct railroads, and to hold the stock of railroad companies. This company is hereafter called for convenience " the coal company."

On September 19, 1881, the subscription books of the coal company were opened, and the entire stock was subscribed for, owned and controlled by Burke and associates.

On September the thirtieth, the Snowfork and Cleveland Coal Company and the Continental Coal Company, Burke and Hickox sold and conveyed to the coal company the 10,000 acres of coal lands, for $150 per acre, which was considerably in excess of the then market price, and more than double the price at which Burke and Hickox had shortly before purchased a part of the same. This sale was made and ratified by the directors and stockholders of the two coal companies first above mentioned, the stock of which was owned by Burke and some of his associates.

On the same day the subscribers to the stock of the coal company transferred the same to the said Greene, the president and the trustee of the consolidated railway company, and a certificate for 15,000 shares, being the entire capital stock, was issued to him as such president and trustee, and no other certificate of stock of said coal company was ever issued.

On the same day the directors and stockholders of the coal company unanimously resolved to join in the mortgage to be made by the railway company to secure the consolidated bonds.

On October 1, 1881, this mortgage was executed by the railway company and the coal company, and was then placed in the hands

of Winslow, Lanier & Co., who delivered it to the Central Trust Company, which, upon October 3, 1881, also executed it, and thereupon it was recorded in the various counties of Ohio through which the railway ran.

The resolutions passed by the railway company on September 28, 1881, and recited in the mortgage, provided that $6,500,000 of said bonds should be reserved for the purpose of being exchanged for bonds of the constituent companies, and "that the remaining 8,000 bonds, amounting to $8,000,000, should be sold and disposed of by the president and executive committee, and the proceeds thereof should be applied for the purpose of double-tracking, equipping and increasing the transportation facilities of, and improving the company's railway, and in purchasing such real estate and other property as in the judgment of its board of directors or of the president and executive committee, the interests of said company require."

It was expressly covenanted in the mortgage by and between the railway company and the trust company, for the benefit and use of all persons who should become holders and owners of the bonds, that $8,000,000 of them should be delivered to the president and vice-president, or either of them, of the railway company, to be used by them in accordance with the stipulations in the said mortgage contained.

On September 22, 1881, the Central Trust Company agreed to accept the trust under said mortgage. The nature and terms of the usual covenants, etc., of first-class Ohio mortgages were never discussed by Burke and associates, nor was there any discussion between them respecting the resolutions to be passed by the railway company authorizing the mortgage, or of the covenants or stipulations to be contained therein, or anything stated therein regarding the proceeds of the said bonds. The draughtsman, in preparing the mortgage, merely followed the precedents in his possession.

At the time of the execution and delivery of the mortgage and the certification and delivery by the trustee of the $8,000,000 of bonds, it was not the intention of the railway company to apply the said bonds, or the proceeds thereof, to double-tracking the road, or to any other of the purposes mentioned in the resolutions of September 28, 1881; but it was the then settled purpose and intention of the said railway company (as Burke and associates and Winslow,

Lanier & Co. and Greene well knew) to apply and permit said Burke and associates to apply the said bonds and the proceeds thereof to paying back the money advanced, as aforesaid, to the purchase of the stock of the constituent companies, and to paying the debt of the coal company for the 10,000 acres of coal lands, and paying compensation to Winslow, Lanier & Co. and to Greene, and generally for the benefit of Burke and associates.

On July 1, 1881, Burke and associates gave Winslow, Lanier & Co. an option for ninety days to purchase $6,000,000, or any part thereof, of the bonds of the railway company thereafter to be issued, at par and accrued interest, upon condition that the said Winslow, Lanier & Co. should apply the proceeds thereof, when purchased, upon the notes of Burke and associates for the proposed $6,000,000 loan.

It was also agreed that Winslow, Lanier & Co. might deduct from the purchase price a commission of two and one-half per cent. Winslow, Lanier & Co., in this matter, were acting in behalf of various parties known collectively as " the commission syndicate."

On July 8, 1881, the subscription list was opened at Columbus, Ohio, for the proposed consolidated bonds, and numerous persons there subscribed for the same at par and accrued interest to the amount of $1,630,000, which amount was subsequently reduced by cancellation of two of the subscriptions to the amount of $1,590,000. This subscription was made before the formation of the consolidated company, the passage of the resolutions authorizing the mortgage or the execution of the mortgage.

On September 28, 1881, Winslow, Lanier & Co. accepted the option of July 1, 1881, to the amount of the Columbus subscription, namely, $1,590,000, and no more.

On September 14, 1881, the railway company, which was then controlled by Burke and associates, executed certain interim bond certificates, by which it agreed to deliver to the order of Winslow, Lanier & Co. and Drexel, Morgan & Co., or either of them, its five per cent fifty-year gold bonds, to be secured by its general railway and first real estate mortgage as soon as the same were ready for delivery. These certificates, representing $8,000,000 of bonds, were delivered by the railway company to Burke and associates in exchange for the 15,000 shares of the capital stock of the coal com-

pany.  Burke and his associates were then the sole stockholders in the railway company, and such exchange of its bonds for coal company's stock was in pursuance of an agreement to that effect entered into by Burke and his associates prior to their purchase of the stock of the constituent companies.  These interim certificates were forwarded by the president of the railway company to Winslow, Lanier & Co., and received by them on September 16, 1881, and delivered by them to Drexel, Morgan & Co. on October 8, 1881, as part of the collateral security for the notes of Burke and associates.

On November 2, 1881, the directors of the railway company passed a resolution directing the president to hand over to Stevenson Burke $6,400,000 of the consolidated mortgage bonds of the company " to apply to the purchase of the stock of the Hocking Coal and Railway Company."  At this meeting all the directors of the railway company were present, and all parties interested in the corporation approved of what was then done.  On the same day an order was drawn upon the Central Trust Company, signed in the name of the railway company, by Greene as president, and Burke as vice-president, directing the trust company to deliver to Stevenson Burke or order 6,411 bonds.  This order was indorsed and delivered by Burke to Winslow, Lanier & Co.  Pursuant to the terms thereof Winslow, Lanier & Co. received said consolidated bonds, being Nos. 1 to 3000, and 3201 to 6611; of these 1,590 bonds, being Nos. 5022 to 6611, were received for account of the railway company, and the remainder were received for account of Burke and associates.  The 1,590 bonds, received for account of the railway company, were used in taking up the company's interim certificates, which were outstanding in the hands of the Ohio subscribers.

A certified copy of the resolution of November 2, 1881, was delivered to Winslow, Lanier & Co., and Burke and associates offered in writing to sell to them 4,821 of said bonds at ninety-two flat, which offer was accepted, payments upon books as delivered to begin on November 4, 1881.  These bonds when received were transferred from the account of Burke and associates to that of the purchasing syndicate, and the account of Burke and associates was credited with the proceeds thereof, viz., $4,435,320.  The entire proceeds of the 6,411 bonds bought by Winslow, Lanier & Co. from Burke and

associates were paid over to Drexel, Morgan & Co. This payment was completed by November 5, 1881, and the bonds purchased for account of the syndicate were duly delivered by Winslow, Lanier & Co. to the parties interested therein. By arrangement between the parties the transactions respecting these bonds took the form of sales from Burke and associates to Winslow, Lanier & Co. No agreement on the subject was made between Winslow, Lanier & Co. and the railway company, and no one ever agreed to pay the railway company for the bonds otherwise than by transfer of the coal lands or stock, and from the beginning it was the intention of Burke and associates that the new bonds of the proposed consolidated company, when issued, should be used to acquire the coal lands.

In November, 1881, said railway company and said Greene as president, and said Burke as vice-president, caused the remainder of said 8,000 bonds, each certified by the trustee in the form set forth in the mortgage, to be delivered by the trust company, who, together with Burke, applied 730 thereof in payment to the vendors of the coal lands, and applied the remainder, viz., 853, of the bonds to the personal use of themselves and associates.

Burke and associates gave to said Greene as compensation for his services to them and as president of said consolidated railway company for the term of five years, 100 of the said bonds and twenty per cent of the whole capital stock of the railway company and an increase of twenty-five per cent in his salary.

The entire 8,000 bonds were issued by the railway company, and delivered to Burke and associates in payment of the capital stock of the coal company, and each and every person in any way interested in the railway company or its property had full knowledge of the use made of the bonds, and approved thereof and assented thereto.

Winslow, Lanier & Co. had no interest in any of the constituent properties which were consolidated. The only meeting of the directors of the railway company which the defendant Ellis ever attended was the one held in the city of New York on the 2d of November, 1881, at which meeting the resolution was passed directing the president to hand over to Stevenson Burke $6,400,000 of the bonds, to be applied to the purchase of the stock of the Hocking Coal and Railroad Company.

On August 14, 1882, meetings were held of the directors and the

stockholders of the railway company, and by a unanimous vote it was resolved that the president be directed to purchase the whole of the stock of the coal company, amounting to 15,000 shares, for the price of $8,000,000, payable in the consolidated bonds of the railway company at par, and that the title to the stock be taken in the name of the president as the trustee for the company; and upon the following day an entry was made in the books of the railway company showing that the 8,000 bonds had been used in payment for the stock of the coal company. At that time all of the stock of the railway company remained in Burke and associates; the first transfer of any stock from them was made on August 17, 1882.

The record of August 14, 1882, is of an actual transaction that had previously taken place. The railway company had previously purchased from Burke and his associates the 15,000 shares of the coal company's stock for the said 8,000 bonds of the railway company, and they had been delivered in payment therefor, and all the directors and stockholders were then and had always been aware of the transaction.

The railway company had always held all of the stock of the coal company, and has constantly voted upon the same and elected its own officers to similar official positions in the coal company, and has always been in control of the books and papers of that company.

In 1884 the railway company and the coal company executed a second joint mortgage covering all the property of both companies, including said 10,000 acres of land, securing the joint six per cent bonds of the two companies for the benefit of the railway company to the amount of $2,000,000. These bonds have been in part sold by the railway company and in part used by it as collateral for loans from time to time. The stock of the coal company stands upon the books of the railway company as the property of the latter company, and no restoration or offer of restoration has been made of any part of what the railway company received in exchange for the 8,000 bonds of which the plaintiff holds a part.

Upon February 10, 1887, the railway company began an action against Burke and some of his associates in the Court of Common Pleas for Franklin county, Ohio.

The petition in this action set forth the same alleged facts regard-

ing Burke and associates as are set forth in the complaint herein, including specifically the resolution now relied upon, and also a copy of the mortgage in full, and prayed judgment against the defendants for the sum due to the railway company by reason of the appropriation of the bonds.

Issue was joined in said action by appropriate pleadings, and on July 1, 1888, an agreement was entered into by the parties submitting all the issues to James C. Carter, E. W. Kitridge and Lawrence Maxwell, Jr. All the parties offered such testimony as they saw fit, attended before the arbitrators, and participated in the hearing.

It was contended before the said arbitrators both that the railway company was a trustee for its creditors generally and that the provisions of the mortgage now relied upon made the railway company a trustee for the bondholders, and it was, therefore, entitled to recover the proceeds of the bonds from Burke and associates as a trust fund.

Upon September 17, 1888, the arbitrators met and delivered their award, finding and deciding all the issues in favor of the defendants, and judgment was accordingly entered in favor of the defendants.

The plaintiff was aware of the pendency of this suit and knew what it was about.

The plaintiff, before he purchased his bonds, which are the subject of this suit, inquired of the defendant Burke concerning them, and also consulted the then current number of Poor's Manual.

Burke informed him that he had sold the entire issue of bonds, and that the bonds were secured by the coal lands, and it appeared in Poor's Manual that the entire 8,000 consolidated bonds had already been issued, and that the company had paid interest thereon, and that among the company's assets was the following item : " Stocks and bonds, $8,000,919.64."

The plaintiff is the holder of fifty of said bonds, numbered from 2 to 50 inclusive and No. 5434. He purchased the same in December, 1883, in open market before maturity, in good faith and for value at the price of seventy-nine and three-fourths. These were among the bonds originally sold and delivered by Winslow, Lanier & Co. to two of the Ohio subscribers.

At the time that the plaintiff purchased these bonds the highest

class of five per cent railroad bonds were selling above par. Since that time the bonds in question have sold as high as ninety-four, and at the time of the trial they were worth, in open market, eighty-seven, and interest has at all times been regularly paid upon them. On December 31, 1890, the securities of the railway company junior to the consolidated bonds amounted to $1,618,000 joint six per cent bonds of the railway company and the coal company and $11,696,300 of capital stock. At the time of the trial the said joint six per cent second mortgage bonds were selling in the open market at ninety-four and one-half, and the said stock of the railway company was selling at thirty-one and one-half, showing a total market value of securities junior to the consolidated mortgage bonds of $5,213,334.

When plaintiff bought the bonds he did not rely upon any of the provisions of the mortgage upon which he now seeks to recover. He simply knew that there was a mortgage and that the bonds were secured thereby, and he relied upon that security. He never had dealings with Winslow, Lanier & Co. with reference to the bonds.

On or about January 11, 1887, the railway company passed out of the control of Burke and associates. Upon that date one Shaw was elected as its president. Since that time the railway company has not been in the hands of the persons who participated in any way in the original disposition and use made of those bonds, or whom the plaintiff had any reason to believe were unwilling to assail that disposition or use.

The present action was begun January 18, 1890. Neither the firm of Winslow, Lanier & Co., nor any of its members, have had any of the consolidated five per cent bonds of the railway company since December, 1883.

*Elihu Root, John F. Dillon* and *S. B. Clarke*, for the appellant.

*Stevenson Burke, Joseph H. Choate, B. H. Bristow, David Wilcox, Hugh L. Cole* and *James W. Hawes*, for the respondents.

PARKER, J.:

It may be assumed that Burke and his associates, having acquired all of the stock of the different railroads and consolidated them into the Columbus, Hocking Valley and Toledo Railway Company, had

the legal right to cause it to be mortgaged in any sum they chose so long as the statutes of Ohio were not contravened. It was their property, and if they deemed it best to cause bonds to be issued, secured by a mortgage in a greater amount than they paid for it, as they did in fact, they had the right to do so and to use every legitimate argument to persuade investors to pay par for them.

The task, probably, would have been difficult if not impossible of accomplishment, and because of that fact, doubtless, the idea was born to attract investors with the assurance that the proceeds of the bonds to be issued, over and above the amount necessary to take up the bonds outstanding of the divisional companies, should be applied in double-tracking, equipping and increasing the transportation facilities of, and improving the company's railway, and in purchasing such real estate and other property as the interests of the company require. This provision, it was but reasonable to assume, would prove attractive to purchasers and enhance the price of the bonds, for, in addition to the equity of the corporation over and above the mortgages on the primary railroads, the security would embrace the result of using the proceeds in improving and adding to the property, and necessarily enhancing its value.

The importance which investors would ordinarily attach to these promises is more fully appreciated when it is considered that the contract of the obligor contained in the mortgage and in the bonds secured by it, is of a twofold nature : *First*, that the sum named in the bond shall be repaid with annual interest; and, *second*, that the money borrowed, of which the bond is the evidence, shall be expended for improvements and betterments to the mortgaged property, and the acquisition of additional property to be subject to the lien of the mortgage.

The first covenant is simply for the repayment of the money borrowed, with the accruing interest. And the second covenant is to secure the loan and make its repayment, with interest, more certain. The improvements and accretions to the mortgaged property were for the benefit of the lender as well as the borrower.

The agreement to make such use of the money was the stipulation of the borrower, upon which the loan was made. It was a material and important part of the obligation of the borrower to assure reimbursement of interest for the use of the fund.

The borrower was obligated to do more than repay the sum borrowed. He covenanted to pay interest for its use. The estate which was the security, and the only security, for such payment, could only be or continue adequate for that purpose by necessary improvements, betterments and additions.

A railroad is an artificial structure. It deteriorates by use and requires frequent renewals. Its value depends on its adaptation for the use to which it is applied, and its earning capacity is an essential part of its value as a security or an investment. This in turn depends on the condition of the road for safe and speedy movement of the trains, adequate rolling stock, and the proper and needful facilities for transportation. If any of these prerequisites are neglected, the value of the property is diminished, and the security correspondingly impaired.

The ability to pay arises from the capacity to earn revenue. And business from which revenue is derived is invited by the character of the transportation facilities supplied. Interest is a fixed and imperative charge, and like operating expenses must be earned from the business done before it can be paid.

The creditor who loans money, therefore, upon the security of such property and upon the condition or covenant that the money loaned shall be applied in improving and increasing the value of the property is vitally interested in the application of the money in accordance with the agreement which has for its purpose the protection of the loan.

And the fact that officers charged with the duty of guarding the interests of the stockholders should deem it wise to incumber the property in so large an amount for the purpose of securing moneys with which to improve it, would naturally suggest that the result of the expenditure would be to largely add to its earning capacity.

But the promise which the mortgage contains was not kept, nor was it ever intended that it should be. Not a dollar of the proceeds of the $8,000,000 bonds was applied in the direction covenanted in the mortgage.

Seven hundred and thirty-six of the bonds were applied in paying the vendors of the lands owned by the coal company, the stock of which was acquired by the consolidated company, but that did not feed the mortgage security, the stock of other companies being

expressly excepted from the operation of the after-acquired prop-
erty covenant in the mortgage.

The proceeds of the remainder of the bonds being applied in
payment of the debt incurred by Burke and his association, in pur-
chasing the stock of the primary companies, or to the personal use
of Greene, and of Burke and his associates.

That the action of Burke and his associates was wrongful and has
resulted in great injustice to the holders of the bonds is apparent.

But so far it has been determined, and it is now vigorously con-
tended by the respondents, that the settled principles of law and
equity which should guide the footsteps of the courts in new fields
of litigation, deny to them all redress.

The ground on which the learned trial court rested its decision
was, that the first holders of the bonds knew of, and participated in
the misappropriation of the proceeds, and thereby lost the right to
enforce the covenant, and that all subsequent bondholders stand in
precisely the same position in reference to it as their predecessors in
ownership.   The assertion of such a proposition is startling, when
we consider that five thousand millions of money have been invested
in the bonds of corporations in this country.

If one covenant constituting an essential part of the obligation
of the instrument can be waived or abrogated by a private unwrit-
ten agreement between the corporation and the first taker of the
bonds and become nugatory in the hands of subsequent purchasers
of the bonds, why may not other covenants be thus eliminated and
the bond itself by this process become a nullity without any indorse-
ment or indication upon the instrument of an alteration in its
character ?

If a secret arrangement, which shall conclude subsequent *bona
fide* purchasers of bonds, may be made to waive or extinguish a
covenant, like the one in this case, to apply the money borrowed in
improving and enhancing the value of the mortgaged property, why
may not the covenant, that after-acquired property shall come under
the lien of the mortgage, be waived with like effect ?   Or, why may
not a secret understanding with the original owner deprive a later
purchaser of the benefit of any covenant contained in the bonds ?

If such a doctrine could be sanctioned, an easy way would be
open for any fraud that ingenuity might devise, and the protection

to purchasers of unmatured negotiable instruments, founded on public policy and carefully guarded by the law, would be effectually destroyed.

How would it be possible for the purchaser in an open market to ascertain if there had existed such an agreement? Where would he go to find out?

Now he understands he must look to the bond and to the mortgage, which is a matter of public record, for the information which he may desire, with full assurance that the conditions contained therein can be enforced for his benefit. It would be a public misfortune if it should be determined that these sources of information are not reliable.

The successive steps leading to the conclusion reached at Special Term are, as I understand them: (1) The bonds were issued to the president and vice-president of the corporation, accompanied with a covenant that the proceeds should be applied to a particular purpose.

(2) The covenant was not then operative, and could not become so while the bonds remained unsold in their hands.

(3) The bonds were then disposed of to Winslow, Lanier & Co., under an agreement the effect of which was to abrogate the covenant.

(4) They could not, therefore, enforce the covenant.

(5) Plaintiff, as the purchaser of the bonds, which were negotiable instruments, did not acquire any greater or other rights to enforce the collateral obligation than his predecessor in ownership had.

The second proposition presents the first legal question in the series of propositions, which is that the covenant could not become operative until after the bonds were sold.

The fifth covenant in the mortgage provides that the 8,000 bonds shall be at once executed by the president and secretary of the railway company, certified by the Central Trust Company of New York, and delivered to the president and vice-president of the railway company, to be used and disposed of by them according to the stipulations thereinbefore contained.

The grant is stated to be "For securing the payment of said bonds to be made and executed to the amount of $14,500,000 * * * and to carry out and effectuate the resolutions aforesaid."

The habendum is "to have and to hold the same   *   *   *   in trust for the use and benefit and security of the several persons and their successors   *   *   *   who shall hereafter become the owners and holders of any of the bonds to the amount of $14,500,000, intended to be hereby secured, and to be made and issued as hereinafter provided."

And the defeasance is, "That the trustee may at any time, whether said bonds are due or not, upon their presentation to it and cancellation by said railway company, cancel this mortgage, and this mortgage shall, upon such cancellation, be null and void   *   *   *   but it is hereby expressly provided, and this indenture is made upon condition, that if the   *   *   *   railway company   *   *   *   shall well and truly pay or cause to be paid all the interest and coupons   *   *   *   and shall pay the principal of said bonds at maturity   *   *   *   and shall keep and perform all and every the covenants herein contained on its part, then and in that case this indenture shall be and become null and void."

And the mortgage further provides that "upon each of said bonds shall be placed the indorsement of the party of the second part, or its successor or successors, without which the bond shall not be entitled to the benefits of this deed, which certificate shall be in substance of the tenor and effect following, that is to say, it is hereby certified that the said bond is one of a series amounting to $14,500,000, secured by the mortgage therein referred to, and duly issued in conformity with its provisions," and signed, "Central Trust Company of New York trustee, by ——, president."

It is apparent that it was the intention of the parties to the instrument, as disclosed by the provisions to which reference has been made, that the covenants contained in the mortgage should go into effect so soon as the trustees should certify and deliver any of the bonds to the president and vice-president of the railway company. It is not conceivable that the trustee would have consented to the contract otherwise, for upon the delivery of the bonds to the officers selected for that purpose by the railway company it was required to certify that the bonds bearing the certificate "had been duly issued in conformity with its provisions."

The parties were competent to make the contract, which we think they intended to make and did make.   The trustee was interested

in having the covenants take effect as soon as the bonds were certified and delivered, for the preservation of its good name as trustee, otherwise its certificates, which were essential to the validity of the bonds, might prove to be false.

The consideration was ample to uphold the contract which the railway company made with the trustee, for it accepted the trust, promised to certify the bonds, which was essential to their validity, and it did, in fact, certify and deliver them.

When that was done, and before their disposition by the officers, it had such an interest in them as entitled it to prevent their disposition for any other purpose than that provided in the mortgage.

For example, had the railway company attempted to make a dividend of half the bonds among its stockholders, and this fact had come to the knowledge of the trustee, there could be no doubt of its right to obtain an injunction preventing such a disposition of them.

The other proposition of the series involving a legal conclusion, to which reference will be made in this connection, asserts that as the first takers of the bonds could not enforce the covenant contained in the collateral obligation, neither could subsequent purchasers. The reasoning which led to this conclusion was that the mortgage was not negotiable, but the bonds were; their negotiable character, however, only extending to the title to the bonds, the amount due thereon, the liability of the obligor and the consideration, and, therefore, as to the obligations of the corporation collateral to those matters, such as the covenant under consideration, a holder of the bonds takes merely as assignee of the first takers.

In support of this proposition are cited *Lamourieux* v. *Hewit* (6 Wend. 308); *Watson's Executors* v. *McLaren* (19 id. 565); *Birckhead* v. *Brown* (5 Hill, 644); *Barlow* v. *Myers* (64 N. Y. 44); *Trust Co.* v. *National Bank* (101 U. S. 68); *Bailey* v. *Smith* (14 Ohio St. 406).

The cases in Wendell presented the question whether a guaranty of the payment of a note by the payee, written in the first case on the note and in the second on a separate piece of paper, inured to the benefit of the subsequent purchaser upon a delivery of the note and guaranty, and it was held that it did not, the guaranty being a special contract and non-negotiable.

In *Birckhead* v. *Brown* the question decided was that letters of credit are not negotiable. Hence, a third person, who advanced money on the faith of a special letter of credit addressed to another, could not recover against the writer, because of the absence of a privity of contract between them.

In *Barlow* v. *Myers* the defendant promised to pay all the debts of a certain firm, and the contract was held to be with the then creditors, and them alone ; that by it the creditors obtained additional security, which would pass by assignment, and, therefore, subject to any equities on the part of the promisor existing against the debt while in the hands of the assignor.

In *Trust Company* v. *National Bank* two propositions only were decided : The defense of a maker of a promissory note can only be cut off by the payee's indorsement of it before maturity, and that a guaranty thereon by the payee is not such an indorsement.

In *Bailey* v. *Smith* it was held that where a negotiable promissory note is transferred to a *bona fide* holder for value before maturity, a defense that the mortgage collateral to it was obtained by fraud by the mortgagee or payee of the note was a valid defense, in an action to foreclose the mortgage by the transferee.

That case was subsequently considered by the Supreme Court in *Carpenter* v. *Longan* (16 Wall. 271), and not followed, the court holding that mortgages given to secure negotiable paper, transferred to a good-faith holder for value, and before maturity, for the benefit of the holder, are subject to no equities, and to no defenses except such as may be asserted against the negotiable paper itself. That rule has been followed in this State (*Gould* v. *Marsh*, 1 Hun, 566), and in other jurisdictions. (*New Orleans* v. *Montgomery*, 95 U. S. 16; *Swett* v. *Stark*, 31 Fed. Rep. 858; Thomas on Mortgages [2d ed.], § 308.)

It will be observed that the facts of the cases relied on to support the judgment rendered are not at all like the one under consideration, but their applicability to the question now presented is said to rest in the fact that they declare certain special contracts to be non-negotiable ; that as this mortgage is a special contract, therefore, it is not negotiable. But with the assertion that this mortgage is not negotiable we have no quarrel.

It has never been understood that mortgages of the character of

the one before us are negotiable instruments, nor has it ever been the theory of the courts that a purchaser of a bond acquires an interest in the mortgage which he can assign when he sells his bond, or that present holders of mortgage bonds are entitled to the benefit of the mortgaged security, because assigned with the secured debt.

But rather that a bondholder's claim is founded on the direct promise of the railway company to himself, by virtue of the trust instrument in which he is described as the beneficiary. Clearly there is no legal obstacle to the making of a contract in which the obligations, with respect to the security for the bonds put out, shall be coextensive with the obligation of the bonds themselves for the purpose of enhancing their public credit and currency.

In *Peoria & Springfield R. R. Co.* v. *Thompson* (103 Ill. 187), a distinction was made between a mortgage for the benefit of some one specifically mentioned, such as the payee of a note, and a deed of trust declared to be for the benefit of the holders of the bonds.

In the first case it was said that the note can only be transferred by indorsement, the mortgage passing in equity as an incident of the debt by virtue of such indorsement.

But that such doctrine has no application to deeds of trust, given to secure a railroad coupon bond intended to be thrown on the market and circulated as commercial paper, and to be used as security for permanent investments.

" To hold otherwise (said the court) would be doing violence to the manifest intention of the parties to such instruments, and would unquestionably lead to very disastrous consequences."

It is the rule as between bondholders and persons acquiring liens on the mortgaged property, subsequent to the recording of the mortgage, that the rights of the *bona fide* holders of the bonds are to be determined as if they had been acquired at the date of the recording of the mortgage securing them.

Necessarily it must be so as against the railway company itself, and as against those chargeable in equity with its obligations.

A *bona fide* purchaser takes such bonds freed from any equities which might have been set up against the original holder. (*Kneeland* v. *Lawrence*, 140 U. S. 209.)

In *Claflin* v. *R. R. Co.* (8 Fed. Rep. 118), Chief Justice WAITE said: " Railroad bonds are a kind of public funds. They are put

on the market and dealt in as such.   *   *   *   When a dealer finds such bonds not yet due in the hands of the company, with the proper certificate of the mortgage trustee upon them, it has, I think, always been understood in the commercial world that he might buy in good faith with safety."

" The security has been considered a continuing one, and the bonds negotiable by the company so as to carry the mortgage security until they have become commercially dishonored."

For the public reason stated by Chief Justice WAITE, coupled with the fact that it is entirely within the power of the railway company, and the trustee under its trust deed, to provide for a continuous security for the benefit of the successive holders of the bonds to be issued thereunder, inquiry should be made whether such intention is manifested in the trust instrument, and, if so, effect should be given to it.

After naming the parties, the mortgage declares that the party of the first part has become the owner of certain railroads, with numerous branches and short lines, and 10,000 acres of coal lands, but certain of the property is incumbered by mortgage given to secure bonds issued, and the recitals continue :

" WHEREAS, said railway company, party of the first part, for the purpose of providing for the redemption and cancellation of the bonds secured by said prior or divisional mortgages, to enable it to borrow a further sum of money found necessary to be used in building and double-tracking its road, paying for property purchased and to be purchased, improvements made and to be made, and for the equipment of its said line of railway, providing terminal facilities, constructing docks, building bridges, and otherwise extending and enlarging its capacity for the transportation of freight and passengers, and for other general purposes of said railway, and for the purpose of resolving its entire bond and mortgage indebtedness into one loan, secured by one consolidated mortgage, has, by its board of directors and all its stockholders, resolved to issue its bonds ;   *   *   *   and,

" WHEREAS, for that purpose the directors and stockholders of the said Columbus, Hocking Valley and Toledo Railway Company, at a meeting held at the office of said company in Columbus, Ohio, on the twenty-eighth day of September, eighteen hundred and

eighty-one, did pass certain resolutions of the tenor and effect following, to wit : ` * * *

" *Resolved,* that the remaining eight thousand bonds, amounting to $8,000,000, shall be sold and disposed of by the president and executive committee, and the proceeds thereof shall be applied for the purpose of double-tracking, equipping and increasing the transportation facilities of and improving the company's railway, and in purchasing such real estate and other property as in the judgment of its board of directors, or of the president and executive committee, the interests of said company require."

These resolutions, the mortgage declares, were, after their passage by the board of directors of the railway company, ratified and adopted by a unanimous vote of the stockholders at a meeting held for that purpose. This statement was followed by a grant, intended to give assurance to all inquirers, that the money to be expended in making the promised improvements should come under the lien of the mortgage. The grant was to the " Central Trust Company of New York, party of the second part, and its lawful successors in the trust hereby created, all and singular the railroad aforesaid, with its appurtenances, depots, depot grounds, branches, switches, tracks, superstructure, real estate, right of way, yards, shops, locomotives, cars, furniture and equipments, and all and every right, title or interest which the said party of the first part had or has, or shall hereafter acquire, in or to the same. * * *" The habendum of the grant to the trustee is : " To have and to hold the same, with the appurtenances, unto the said party of the second part, its successors and assigns, in trust, for the use and benefit and security of the several persons and their successors, administrators, executors or assigns, who shall hereafter become the owners and holders of any of the bonds to the amount of $14,500,000 intended to be hereby secured, and to be made and issued as hereafter provided. * * *"

The covenants which immediately follow the habendum to the grant are introduced with a clause which, standing alone, would seem to put at rest all contention touching the question whether it was the intention of the parties to contract for the benefit of and with the persons who should become the holders of the bonds. It reads :

"And it is hereby expressly covenanted and agreed by and

between the parties hereto, each covenanting and agreeing respectively for themselves and their successors and assigns, and for the benefit and use of all parties who shall become holders and owners of the bonds issued under and secured, or intended to be secured, in manner following, that is to say :

" *First.* That the said parties of the first part do hereby covenant for themselves and successors severally, and do agree to and with the party of the second part and its successors, and to and with the holders of each and every of the bonds issued or to be issued under and secured by this indenture, that it will satisfy and cancel all valid and existing bonds now outstanding.   *   *   * "

" *Fifth.* Eight thousand of all bonds, amounting to eight million dollars, numbered from one to eight thousand, shall be at once executed by the president and secretary of said railway company, and certified by said Central Trust Company of New York, trustee, and delivered to the president and vice-president, or either of them, of said party of the first part, the Columbus, Hocking Valley and Toledo Railway Company, to be used and disposed of by them in accordance with the stipulations hereinbefore contained.   *   *   * "
The stipulations referred to being evidently those thereinbefore recited in the resolutions.

It is apparent from the provisions quoted that the parties to the instrument intended that the general understanding of the public, that it is beyond the power of the first takers, or any of the successive holders of the bonds, to diminish the security or in any way affect the rights of subsequent holders, should be assured to those who might inquire respecting it.

They manifest the intention of the parties that the contract should be for the benefit of and directly with all persons who should become holders of the bonds. And disclose a settled purpose to assure all purchasers of bonds that the obligation of the company touching the security would be equal in all respects with its obligation on the bonds. And they thereby entered into a contract with the subsequent purchasers of the bonds to that effect.

The mortgage contained no provision whatever which suggests a discrimination based upon the time of performance, and none can be implied.

By virtue of the covenants, therefore, the trustee became vested

with certain rights against the railway company, upon which was declared a trust in favor of all who should become holders of the bonds, and an examination of the mortgage discloses but one method by which such rights can be affected or the trust declared thereon destroyed.

Provision was made for a surrender and cancellation by the company of all the bonds secured by the mortgage, but in no other way could the company terminate the trust. Its effect was to impress on the specific bonds numbered from 1 to 8000 inclusive, and their proceeds, a lien or equity in the nature of a trust for the application thereof to the purpose specified in the mortgage.

In Pomeroy's Equity Jurisprudence (§ 1235), the general rule is stated as follows:

" The doctrine may be stated in its most general form, that every express executory agreement in writing, whereby the contracting party sufficiently indicates an intention to make some particular property, real or personal, or fund therein described or identified, a security for a debt or other obligation, or whereby the party promises to convey, or assign, or transfer the property as security, creates an equitable lien upon the property so indicated, which is enforceable against the property in the hands not only of the original contractor, but of his heirs, administrators, executors, voluntary assigns and purchasers or incumbrancers with notice."

Illustrations of the application of this doctrine may be found in the following cases: *Pennock* v. *Coe* (23 How. [U. S.] 117); *Weetjen* v. *St. Paul & P. R. R. Co.* (4 Hun, 529); *Van Weel* v. *Winston* (116 U. S. 228); *Ketcham* v. *St. Louis* (101 id. 306); *Hauselt* v. *Harrison* (105 id. 401); *McMurray* v. *Moran* (134 id. 150); *McGourkey* v. *Toledo R. R. Co.* (146 id. 536); *Rogers* v. *Land Co.* (134 N. Y. 197).

In *Pennock's* case, the court, in reaching its conclusion, made use of the following argument: " We think it very clear, if the company, after having received the money upon the bonds, and given the mortgage security, had undertaken to divert the fund from the purpose to which it was devoted, namely, the construction of the road and its equipment — and upon which the security mainly depended — a court of equity would have interposed and enforced a specific performance."

In *Van Weel's* case, the decision was to the effect that when a mortgage contains a provision for the application of the proceeds of bonds in particular ways, that provision is binding and enforcible by those in whose favor it was made, but if there remains a surplus after accomplishing such purpose, it is unincumbered by any trust in favor of the bondholders.

This principle also receives consideration in Story's Eq. Juris. (§ 1237); 2 Pomeroy's Eq. Juris. (§§ 1051–1058); Perry on Trusts (§§ 245, 246).

It would seem to follow that so long as the bonds are outstanding unmatured, which were duly certified by the trust company, it is its right and duty to enforce all of the provisions of the security for the benefit of present bondholders, as well as those who may hereafter become such.

It is true that the mortgage provides that the trustee shall be in no respect answerable for the use made of the bonds by the president or vice-president of the railway company after their certification and delivery by the trustee, but that in no way lessens the obligation which the trustee assumed when it accepted the trust, to use due diligence to save its *cestuis que* trust from injury.

It was, and still is, its duty to proceed in court to redress any remediable wrong which has resulted to its *cestuis que* trust from a breach of the covenants of the deed of trust.

If the views so far expressed are sound, it follows :

(1) That the contract made between the railway company and the trust company was for the benefit of, and with all persons who should at any time become holders of the bonds, securing to them the benefit of the security according to the terms of the mortgage, free and clear of all equities which might exist as against prior holders.

(2) The railway company's right of dominion over the bonds in question, and the proceeds thereof, was so qualified that it was bound to make use of them to feed the mortgage security.

(3) The trustee was charged with the duty of using reasonable diligence to secure faithful performance on the part of the railway company, in the interest of the bondholders, present and future.

Whether the proceeds of the bonds, or any portion of them, were so applied as to improve the mortgage security will now be considered.

Six thousand four hundred and eleven (6,411) of them were used by Burke and his associates in satisfying the $6,000,000 loan from Winslow, Lanier & Co., and in compensating them for their services. Eight hundred and fifty-three (853) of them were applied to the personal use of Greene, Burke and his associates, and the remaining seven hundred and thirty-six (736) were used by Burke and associates in paying for lands which they had purchased and sold to the "Hocking Coal and Railroad Company," the stock of which was acquired by the consolidated company.

There is no room for pretense even, that the proceeds of any portion of the bonds, except seven hundred and thirty-six (736), were so applied as to enhance the value of the mortgage security.

And they were in fact used to pay a debt which Burke and his associates had incurred in buying coal lands, which were conveyed to the coal company and afterwards became subject to the lien of the trust mortgage.

It may be but for such payment Burke's predecessors in title would have had a vendor's lien, which would have had priority over the mortgage lien, and it is said that to the extent of such payment the mortgage security was in fact fed.

But the mortgage embraced the coal lands, as well as the property of the primary railroads, and it assured to the bondholders, as it was intended that it should, that the property therein described was only incumbered to the extent of six and one-half millions, which incumbrance was all upon the property of the primary railroads. So that in paying the debt of Burke and associates for the coal lands, the bondholders received no added benefit to that which the mortgage undertook to assure to them.

That which was done with the bonds was substantially in accordance with the scheme of Burke and associates prior to the formation of the consolidated corporation, and necessarily before the execution of the mortgage.

One of the modes by which it was sought to carry out the plan, so as to give it the appearance of legality and the semblance of honesty, was by the exchange of 15,000 shares of the coal company's stock for the 8,000 bonds of the railway company.

As the par value of the coal stock was one hundred dollars ($100)

per share, the exchange was of stock representing one and one-half millions for bonds of $8,000,000.

At the time of the exchange Burke and associates owned all the stock of the railway company, except seven outstanding shares of one of the primary companies, and controlled its board of directors, executive committee, president and vice-president. They also owned or controlled all the subscriptions to the stock of the coal company, which they caused to be transferred to Greene, the president of the railway company, and a certificate for the 15,000 shares to be issued in his name as president, which was the only certificate ever issued.

Burke and his associates, therefore, represented both parties to the transaction.

It is true that by this transaction the railway company acquired the stock of the coal company, but it is clear, we think, that the mortgage security was not in anywise benefited by its acquisition.

(1) Because the stock, notes or bonds of other companies are expressly excepted from the clause providing that after-acquired lands, property, rights and franchises shall pass under the lien of the mortgage, and become part of the security for the payment of the bonds.

(2) Stocks of other corporations are not included in the enumeration of property in which it is covenanted that the proceeds shall be invested. The covenant is that the proceeds "shall be applied for the purpose of double-tracking, equipping and increasing the transportation facilities of, and improving the company's railway, and in purchasing such real estate and other property as in the judgment of its board of directors, or of the president and executive committee, the interests of said company require."

It is contended that stock of other companies is "other property," within the meaning of the mortgage stipulation as to the use of the bonds.

If this contention be well grounded, then, by the use of those two words, a way was opened through which the bonds could be entirely applied in the purchase of stock, notes and bonds of other companies, which would not fall under the lien of the mortgage, because specifically excepted in the after-acquired property covenant.

The construction contended for cannot obtain because,

*First.* The statute law of Ohio did not authorize the borrowing of money on bond and mortgage for the purpose of purchasing stocks of other companies, and, therefore, it comes within the rule that where a contract permits of two constructions, the legal rather than the illegal will be deemed the true construction. (*Hobbs* v. *McLean,* 117 U. S. 567.)

*Second.* The rule of construction that where the words of a promise may have been used in an enlarged or restricted sense, they will be generally construed in the sense most beneficial to the promisee· (*Hoffman* v. *Ins. Co.,* 32 N. Y. 405), is especially applicable here, where, if the words be construed in the enlarged sense, they would permit an entire diversion of the proceeds of the bonds from the purpose which the corporation intended to assure the purchasers they were to be used for.

*Third.* If the meaning contended for should be given to the words "other property," it would be in violation of that settled principle of construction, that where words of general description are associated with words of particular description the general words, in the absence of anything clearly manifesting a contrary intent, shall be limited so as to be *ejusdem generis* with the particular words. (1 Chitty on Cont. [11th Am. ed.] 181; *Alabama* v. *Montague,* 117 U. S. 602 ; *Matter of Reynolds,* 124 N. Y. 388.)

The general words "other property," therefore, must be limited to property of the general character of that particularly described, which referred to improving the property of the corporation and the purchase of such real estate as its interests required.

Stocks and bonds of other companies are not *ejusdem generis* with double-tracking, equipping and improving the company's railway, and, therefore, are not "other property" within the meaning of the stipulation.

We have already observed that the effect of the mortgage covenant was to impress on the bonds in question a lien or equity in the nature of a trust, for the application thereof, in the manner provided in the mortgage, and, if this position be well taken, it affords adequate ground for relief in equity against Burke and his associates.

They had full knowledge of all the circumstances creating the lien. They caused to be organized the corporation which made the

trust deed; owned all the stock of such corporation; elected and controlled its directors and officers; the corporate action was always in accordance with their wishes; the resolution directing the making of the mortgage, the issuing of the bonds and reciting the purposes to which they were to be applied, was in response to their commands, and they occupied precisely the same relation to the coal company.

And in what the president and vice-president Burke did in pretending to exchange the bonds for the stock of the coal company, they in form obeyed the directions of the company, but in reality they but carried out the wishes and directions of Burke and his associates.

And a court of equity will go behind the corporate veil, with which these parties undertook to hide from view the real transaction and the parties who were executing it, and administer equity in accordance with the facts disclosed.

The exchange of the bonds for the stock was in contravention of the statute of the State under which these corporations were organized. Of this fact Burke and his associates must be presumed to have had knowledge, and in bringing about the transfer of the bonds, Burke and Greene, in practical effect, acted for Burke and his associates.

If that transaction be regarded as a disposal of the bonds, they are chargeable in equity with knowledge of the trust lien, and it may be enforced against them. If it be treated as invalid and a mere cover, then the transfer from the authorized officers of the corporation, of which Burke was one, to "Winslow, Lanier & Co.," resulted in effect in the receipt of the proceeds by Burke and his associates. It is true the money was not put in the hands of Burke and his associates, but it was in legal effect paid to them, because, being indebted to Drexel, Morgan & Co., from whom the loan was procured by Winslow, Lanier & Co., they directed the proceeds to be applied in payment of such debt.

For these reasons, equity can and should require Burke and his associates to turn over the proceeds of the bonds to the railway corporation, to the end that it may in turn be required to apply them in accordance with the covenants contained in its mortgage.

There is another ground on which a court of equity is warranted

in taking jurisdiction to decree an application of the funds in the hands of Burke and his associates to the promised purpose, that is, that the conduct of Burke and his associates was fraudulent.

The fraud was not of such a character as would permit of redress in a court of law, but it was, we think, sufficient to enable a court of equity to compel them to do that which they professed an intention to do, but did not, to the injury of the trustee and bondholders.

The court has found as a fact, that " Burke and associates and said Milbury M. Greene combined together to make money and gains for themselves by the means and in the manner following: * * * By concealing and causing said consolidated company * * * to conceal the use intended, as aforesaid, to be made of said $8,000,000 of bonds, and by causing said consolidated company in said mortgage to represent that it was its intention and purpose to apply said $8,000,000 of bonds and their proceeds in the way specified and limited in the corporate resolution to be set forth in the said mortgage (these being such as would improve the mortgage security). * * * That such scheme was carried out by said Burke and associates and said Greene, substantially as hereinafter set forth." By the execution of this plan they obtained, as they originally intended to do, a benefit to which they were in no way entitled, because the promise necessarily enhanced the credit of the bonds with the public, and their action at the same time deprived the mortgage trustee and the bondholders from obtaining the benefit which the covenant in the mortgage entitled them.

The means by which they were enabled to perpetrate this fraud upon the trustee and bondholders, was due to the absolute control which Burke and his associates exercised over the railway corporation. A control which was, from the beginning, deemed an essential requisite to the carrying out of the plan which they originated and executed.

How they were enabled to exercise complete control over the corporation and its officers has already been adverted to.

It is enough in this connection to say that the railway company had no will except theirs. That while many things were done which took the form of corporate action, they were, nevertheless, inspired and commanded by them, and were in reality their acts. Under these circumstances, the corporate action taken, which was

essential to the wrongful scheme which they originated and were enabled to execute in part by the creation of the corporation, is properly chargeable to them.

Having caused the covenants to be made, they were bound in good conscience to promote performance of them.

This they did not do, nor did they intend to permit it to be done, when they caused the promise to be made.

Such conduct is inconsistent with upright dealing, but consistent with an intention to deceive. The result of their action was a fraud on the trustee, for, by reason of it, there was put upon the market bonds bearing its certificate, which operated to assure investors of the *bona fides* of the entire transaction, when in truth it was wholly wanting.

A wrong has been done the *bona fide* bondholders, for they have been deprived of the added security which the mortgage promises. That the execution of the promise made would have been of very considerable advantage to them has support in the fact that at the trial the bonds did not have, and never had had, a market value equal to their par value.

In Pomeroy's Equity Jurisprudence (Vol. 2, § 873), it is said: "It has been shown in a former chapter that the jurisdiction of Chancery was originally rested upon two fundamental notions — equity and conscience or good faith. The first of these embraced all cases where a party acting according to the rules of the law, and not doing anything contrary to conscience or good faith, might obtain an undue advantage over another, which, though strictly legal, equity would not permit him to retain. The second embraced all those cases where a party, although, perhaps, still keeping within the limits of the strict law, so as to be sustained by the law courts, had committed some unconscientious act or breach of good faith, and had thereby obtained an undue advantage over another, which advantage, even though legal, equity would not suffer him to retain. The relief given by equity in all cases of fraud is plainly referable to this second head of the original jurisdiction."

It does not require argument, but only a simple statement of the facts, such as has already been made, to demonstrate that, under the rule thus laid down, defendants can in equity be required to place the fund which they have diverted where it of right belongs.

*Brackett* v. *Griswold* (112 N. Y. 454) and *Piper* v. *Hoard* (107 id. 73) afford illustrations of cases on each side of the dividing line, between courts of law and equity, touching the subject of fraud, pointed out in the quotation which we have taken from Pomeroy's Equity Jurisprudence. In *Brackett's* case, which was a common-law action for fraud and deceit, it was asserted that the essential constituents of such an action are as follows : Representations by the defendant calculated and intended to influence the plaintiff, and which came to his knowledge, and in reliance upon which he, in good faith, incurred the obligation which occasioned the injury. The absence of any one of these circumstances was declared to be fatal to a recovery.

In *Piper's* case a father died seized of real estate, which he devised to his two sons, A. and B., subject to the limitation as to B., that should he die without issue, his share should go to A.; thereafter B. conveyed his interest in such real estate to defendant, who subsequently induced C., plaintiff's mother, to marry B., by means of the false and fraudulent representation that B. had a fine property so left to him that if he married and had an heir, the land would go to the heir.

The plaintiff was the only child of the marriage. At the time of the commencement of the suit the real estate had been partitioned between A. and defendant as the grantee of B. The relief prayed for was that plaintiff be declared the owner of the portion so acquired by defendant.

It was held that, inasmuch as the plaintiff would have had the property had the representations been true, the defendant should make it good to her; that while it was true the representations were not made to the plaintiff, for she had not yet been born, they were made in her favor and inured to her right. The result was worked out in that case by way of equitable construction, the fraudulent holder of the property being converted into a trustee to preserve it for the purpose of recompense. The court said : " There is no legal objection towards constituting such a trustee in favor of one who was not in esse when the fraud was perpetrated, so long as it can be seen that such person seeks to take the property which the defendants hold by virtue of his fraud."

Other illustrations of the jurisdiction of equity under the head to

which reference has just been made, may be found in *Matter of O'Hara* (95 N. Y. 412); *Verplanck* v. *Van Buren* (76 id. 247); *Brown* v. *Lynch* (1 Paige, 147), and *Moore* v. *Crawford* (130 U. S. 122).

In the latter case the court quotes with approval from Story's. Equity Jurisprudence as follows: "Fraud, indeed, in the sense of a court of equity, properly includes all acts, omissions and concealments which involve a breach of legal or equitable duty, trust or confidence, justly reposed and are injurious to another, or by which an undue and unconscientious advantage is taken of another."

But while the conduct of Burke and associates has been unconscionable, being inspired solely with a desire to make gains to themselves by deceiving others, no basis appears upon which to found a charge of fraudulent misconduct against Winslow, Lanier & Co.

It does not appear that they were parties to the original scheme of Burke and associates, nor that they understood that it was their intention from the first to cause this covenant to be inserted in the mortgage for the purpose of attracting investors.

So far as their knowledge is concerned, the utmost suggested by the findings is that they had seen the mortgage, and knew its contents, so that when they paid for the bonds by paying the notes of Burke and his associates, they must have been aware that the fund was not appropriated for the purposes covenanted in the mortgage. But knowledge of that fact, coupled with the further one that they consented to the application of the proceeds in payment of the loan which they had procured, in the absence of any conspiracy between them and Burke and his associates, having for its object the accomplishment of that for which the latter planned from the beginning, is not sufficient to charge them with liability under this head of equitable jurisdiction.

We have asserted the liability on the part of the defendants Burke and his associates in equity, under another head of equitable jurisdiction, and it is contended that under it the defendants Winslow, Lanier & Co., are also liable.

It is found as a fact that in November, 1881, six thousand four hundred and eleven (6,411) of the bonds were delivered to them, the proceeds to be applied in payment of their certificates, and to satisfy notes aggregating $6,000,000 which they had delivered to Drexel,

Morgan & Co., and that their action was taken with knowledge of the mortgage and its covenants, resolutions and stipulations.

Were there no other facts, it may well be that equity would declare and enforce a lien on the proceeds of the bonus in their hands. But there were other facts.

Nearly three months before the passage of the resolutions by the railway company, authorizing the making of the mortgage and asserting the purposes for which the bonds were to be used, an agreement was entered into between Burke and his associates and Winslow, Lanier & Co., by which the latter were to furnish the former with the funds necessary for the purchase of the stock of the primary railroads. It provides, in part, that as soon after the contemplated consolidation as possible, Burke and his associates shall cause to be issued a consolidated mortgage upon the consolidated railway, covering all its property, and ten thousand (10,000) acres of coal lands for $14,500,000, $6,500,000 not to be issued or used except to pay off or cancel the outstanding bonds of the primary railroads, and bonds representing $8,000,000 to be delivered as additional security for the loan. It was also agreed that the bonds should be duly vested in Burke and his associates prior to their delivery, so that they would be proper collateral to their indebtedness.

The court further found that they had no interest in the properties which were consolidated, and it does not appear that they had any knowledge of the intention of Burke and his associates to enhance the value of the bonds, by inserting covenants in the mortgage to the effect that the proceeds of the bonds should be so applied as to feed the mortgage security.

Indeed, it is difficult to conceive that they would have made the contract which they did make with knowledge of the scheme which Burke and his associates then contemplated and subsequently executed.

On the same day a further agreement was made between the parties, which secured to Winslow, Lanier & Co. the option to purchase $6,000,000 of the bonds within ninety days at par and interest, in which it was further provided that the proceeds of the bonds purchased should be applied in payment of the notes given by Burke and his associates to secure the loan of $6,000,000.

To such a plan as the agreement of the parties apparently contemplated, it does not seem as if there could have been any legal objection.

It had in view the purchase of all the stock of the railroads, and their subsequent consolidation into one railroad company, of which Burke and his associates should be the owners of the capital stock, which would justify them in giving a mortgage to secure as many bonds as they chose, so long as no deception should be practiced for the purpose of inducing investors to pay a larger sum for them than they were fairly worth.

Prior to the passage of the resolution authorizing the mortgage, and on September fourteenth, an interim certificate to the amount of $8,000,000 was issued by the railway company and delivered to Winslow, Lanier & Co., who in turn delivered it to Drexel, Morgan & Co., as part of the collateral security provided for in the agreement of July first.

Under the date of July eighth, Winslow, Lanier & Co. received subscriptions for the bonds amounting to $1,590,000, and, in accordance therewith, they accepted the option to purchase bonds in the amount so subscribed. It was not until October second that they saw the mortgage which supports the finding that they had knowledge of its covenants and stipulations. It does not appear that prior to that time they had any suspicion that the mortgage was to contain any such covenant. Their conduct seems to indicate that they could not have had. But at that time they had fulfilled their part of the agreement. The loan had been procured for Burke and his associates; the option to a considerable amount of the bonds had been accepted, and the interim certificate, which was to be replaced by the bonds, had been accepted as collateral. Under these circumstances it would be most inequitable to charge them with the proceeds of the bonds unless they were at the time of their receipt in a position to effectually insist that the contract with them should be carried out — the first instrument canceled — and a new mortgage executed, and bonds issued, which should not on their face prohibit the use of the proceeds in the manner then intended. In respect to this question the findings are silent, and as the evidence is not contained in the record before us further consideration should be postponed until, on a new trial, the evidence in relation

to the conduct of the parties in this respect shall have been fully brought out.

The conclusion is reached that the trustee was entitled to maintain a suit against Burke and his associates, but it refused to commence one, although duly requested by the plaintiff, who at the same time informed it of the principal facts which were proved on the trial. Belden, being a *bona fide* owner and holder of fifty bonds, as he is and has been since December, 1883, thereupon became entitled to bring this suit, as he has, in behalf of himself and all others similarly situated.

The judgment should be reversed and a new trial granted, with costs to the appellant to abide the event.

VAN BRUNT, P. J., and FOLLETT, J., concurred.

Judgment reversed and new trial granted, with costs to the appellant to abide event.