JAMES J. BELDEN, Respondent, *v.* STEVENSON BURKE, Impleaded with Others, Appellant.

APPLICATION OF RAILROAD BONDS — PURCHASE WITH NOTICE. In a suit in equity, brought by a plaintiff as a holder of bonds of a railroad company secured by a mortgage, on behalf of himself and other bond-holders, on the refusal of the trustee to sue, to obtain redress for a breach of an alleged covenant in the mortgage to devote the bonds or their proceeds to the improvement of the mortgaged property and to enhance the security of the mortgage lien, it appeared that the plaintiff purchased his bonds in the open market, after full inquiry, with knowledge of the situation and how the bonds or their proceeds had been used, and that he did not act upon the faith of any statement in the mortgage, but upon his own judgment. *Held,* upon the ground of the plaintiff's relation to the litigation, that the action could not be maintained; but without expression of opinion upon the question whether, in the absence of notice to the plaintiff of the facts when he purchased the bonds, the action could or could not be maintained.

*But held also,* that subsequent holders of bonds in good faith and without notice are not precluded from relief, on the ground that the first takers of the bonds from the railroad company took with notice of the actual transaction.

*Belden* v. *Burke* (72 Hun, 51), reversed.

(Argued October 25, 1895; decided November 26, 1895.)

APPEAL from order of the General Term of the Supreme Court in the first judicial department, made November 16, 1893, which reversed a judgment of Special Term dismissing the complaint upon the merits and ordered a new trial.

The nature of the action and the material facts are stated in the opinion.

*Stevenson Burke* and *William B. Hornblower* for appellant.

*John F. Dillon, Elihu Root* and *Samuel B. Clarke* for respondent.

O'BRIEN, J.   The plaintiff, as a bondholder of the Columbus, Hocking Valley and Toledo Railway Company, brought this action in his own behalf and in behalf of all other persons holding the bonds, against the railway corporation, the trustee named in the mortgage executed to secure the payment of the bonds, Stevenson Burke and five other persons, called his associates in the transactions hereinafter referred to, two banking firms in the city of New York and three other persons who represent deceased parties or dissolved firms connected in some way with the transactions.   Four of the associates of Burke were never served with process, and are not before the court, the complaint was dismissed at the trial by consent as to one of the banking firms, the other defendants either have no interest in the controversy or acquiesce in the decision below, or are interested in the plaintiff's success and have not appealed from the judgment.   The only party who has appealed to this court is the defendant, Stevenson Burke, who has stipulated that in case the judgment of the court below be affirmed here, then that judgment absolute be rendered against him for the relief demanded in the complaint. He is the only defendant who has appeared in this court to contest the decision given, he having for some reason assumed the whole burden of the litigation, and must, therefore, be considered as the sole responsible defendant.

The general purpose of the action is to compel the railway corporation, defendant, to make good its covenant in the mortgage to devote the bonds, or their proceeds, to the improvement of the mortgaged property and the enhancement of the value of the security to all the bondholders, and it being alleged that the defendant Burke and his associates, as directors and agents of the railway, by means of various transactions stated and found, diverted the bonds from the uses and

purposes for which they were issued, and virtually applied and converted them, or the proceeds, to their own use, that they account for the same to the railway company and pay the same into its treasury. The bonds in controversy amount to eight million dollars, or eight thousand bonds of one thou. sand dollars each, part of an issue of fourteen million five hundred thousand dollars, secured by a mortgage on the railway property to the Central Trust Company of New York as trustee, bearing date October 1, 1881. The decision of the court below, now before us for review, is to the effect that Burke and his associates are bound to account to the railway company for these eight thousand bonds or their proceeds, with interest from the time of the issue, in 1881, thus establishing a liability on the part of the defendant of fifteen million dollars or more. The complaint charges various acts and transactions on the part of Burke and his associates in regard to the issue and disposition of the bonds, constituting, as is claimed, fraud and conspiracy, or breach of trust, or both, all of which allegations have been put in issue by his answer. These complicated transactions were settled by the trial court in one hundred and forty-three findings of fact and six of law. The case comes here upon these findings alone and upon the exceptions taken by the plaintiff's counsel to the conclusions of law upon which the complaint was dismissed. The General Term, having reversed the judgment of the trial court, taking an entirely different view in regard to the defendant's liability, these findings of fact, upon which all the parties stand, must constitute the basis of the discussion. Many of the findings are in regard to facts merely introductory or supplementary, and as they are fully stated in the report of the case in the court below (*Belden* v. *Burke,* 72 Hun, 51) it will be necessary to refer here to only a few of the findings which contain the important or fundamental facts.

On the 22d of December, 1883, the plaintiff bought in the open market at the Stock Exchange in New York, and he now owns, fifty five per cent fifty-year bonds of the said rail-

way company, certified by the trustee named in the mortgage in the manner and form therein prescribed. The interest on these bonds was payable semi-annually from the first day of September, 1881, on the first day of March and September thereafter, and the principal was not to become due till September 1, 1931, when the bonds mature. These bonds of the denomination of one thousand dollars each were a part of a large block of about six million dollars sold at or prior to the date of their issue and delivery to one of the defendant banking firms, Winslow, Lanier & Co. When the plaintiff procured the bonds he had no knowledge of the provisions of the mortgage upon which his claim in this action is based, and did not rely on the same. He knew generally that the bonds were secured by a mortgage, and relied upon that security whatever it was. The plaintiff asserts in this action only such rights as he claims the Central Trust Company, trustee in the mortgage, could or should have asserted for him and his fellow bondholders in the performance of its duty as trustee. It has been found that it refused to bring the action upon plaintiff's request for the benefit of himself and the other holders of the bonds, and, upon such refusal, the action was brought in its present form, the trustee, upon refusing to become a plaintiff, having been made a defendant. The mortgage executed October 1, 1881, covers all the property and franchises of the railway company, and the Hocking Coal & Railroad Company united in it, conveying upon the same trusts some ten thousand acres of coal lands, the previous arrangements and transactions having all along contemplated the union of the properties of the two corporations, which was practically consummated, so far as it could be, by this act.

The defendant railway was created by a consolidation under the laws of Ohio of three other railways, forming a continuous line from Toledo through the Hocking valley in the state of Ohio to some point or points at or near the Ohio river, with various branches, and the scheme of consolidation had in view from the beginning the final union of the coal company property and that of the consolidated railway corporation,

69

and the execution of the mortgage was the important and one of the final acts through which that end was accomplished. The facility with which the defendant and his associates were able to bring about this result by means of contracts, resolutions and various corporate acts was due entirely to the fact that they had acquired and owned all the stock of both companies, so that both corporations were made, through the directors, to move, speak and act in absolute obedience to the will of a few men who owned them. Among the numerous questions in the case which constitute the subject of contention between counsel and in regard to which there is a wide and irreconcilable difference of opinion, the correct interpretation and meaning of certain provisions of the mortgage, thus executed, takes an important place, if, indeed, it is not at the basis of the whole controversy and the necessary premise from which every proposition asserted by the plaintiff is deduced. The learned counsel for the plaintiff contend that by its terms the bonds in question were devoted to the improvement and enlargement of the mortgaged property by adding to its value in such a manner as to increase the security of the bonds, or, as counsel express it, to feed the mortgage lien, while, in behalf of the defendant, it is just as stoutly urged that the language used did not put any such restriction upon the railway, or its officers, in regard to the use of the bonds or their proceeds. It is impossible to get a clear view of this question without reference to the terms of the instrument itself.

In the habendum clause five distinct covenants were inserted, and the last of these is the one with which we are now concerned. It reads as follows :

" And it is hereby expressly covenanted and agreed by and between the parties hereto, each covenanting and agreeing respectively for themselves and their successors and assigns, and for the benefit and use of all parties who shall become holders and owners of the bonds issued under and secured or intended to be secured hereby in manner following, that is to say    *  *  *

" FIFTH. Eight thousand of said bonds, amounting to
$8,000,000, numbered from 1 to 8000, shall be at once exe-
cuted by the president and secretary of said railway company
and certified by said Central Trust Company of New York,
trustee, and delivered to the president and vice-president, or
either of them, of said party of the first part, the Columbus,
Hocking Valley and Toledo Railway Company, to be used
and disposed of by them in accordance with the stipulations
hereinbefore contained; but the said trustee shall be in no
respect answerable for the use made of such bonds, or either
of them, by the president or vice-president of said Columbus,
Hocking Valley and Toledo Railway Company after the cer-
tification of such bonds and the delivery thereof. The
remaining six thousand five hundred bonds, numbered from
8001 to 14500 inclusive,  *   *   *   shall be deposited with
the said trustee  *   *   *   and used  *   *   *   for the pur-
pose of being exchanged for  *   *   *   or providing for the
payment and satisfaction of the outstanding bonds," etc.

It is plain enough from this provision that six million five
hundred thousand of the whole issue of bonds was to be used
for the purpose of retiring the outstanding bonds of the three
divisional roads that had been absorbed in the consolidation.
As to these bonds there is no question raised or any claim that
they were not honestly applied to the purposes for which they
were executed. The controversy arises solely from the dispo-
sition made of the other eight thousand bonds, which, in the
language of the covenant, were to be used and disposed of by
the president and vice-president of the railway " in accordance
with the stipulations hereinbefore contained," and these
stipulations must be found, if at all, in the preceding portions
of the instrument. If we can find any language there
employed by the railway corporation or its directors, which
fairly denotes the uses or purposes to which these bonds or
their proceeds were to be applied, that may be regarded as the
stipulation referred to in the covenant, whatever form of
statement was employed. The instrument begins with a long
recital in the form of a preamble, giving a full history of the

origin, property and financial necessities of the new or consolidated railway, and this part of the preamble concludes in the following language:

"Whereas, said railway company, party of the first part, for the purpose of providing for the redemption and cancellation of the bonds secured by said prior or divisional mortgages, to enable it to borrow a further sum of money found necessary to be used in building and double-tracking its road, paying for property purchased and to be purchased, improvements made and to be made, and for the equipment of its said line of railway, providing terminal facilities, constructing docks, building bridges, and otherwise extending and enlarging its capacity for the transportation of freight and passengers, and for other general purposes of said railway, and for the purpose of resolving its entire bond and mortgage indebtedness into one loan, secured by one consolidated mortgage, has, by its board of directors and all its stockholders, resolved to issue its bonds payable in gold coin of the United States, of the present standard of weight and fineness, as hereinafter specially provided, in the sum of $14,500,000."

Then follows the form of the proposed bond in full in the ordinary form of such obligations, without any words to indicate upon its face the use to which it or the proceeds were to be applied. It must be confessed that the language here employed, with respect to the use of the bonds, is quite broad and general, and if nothing else could be found in the instrument on that subject it would be quite difficult to adopt the construction for which the learned counsel for the plaintiff contends. But the resolutions of the board of directors authorizing the execution of the mortgage were also incorporated in full in a subsequent part of the preamble, and that part of them relating to the use of the bonds is as follows:

"*Resolved*, That six thousand five hundred of said bonds, amounting to $6,500,000, shall be reserved and held by said trustee, and issued and used for the purpose of being exchanged for, or providing for, the payment of the outstanding bonds of said Columbus and Toledo and Columbus and Hocking

Valley railroads, and the Ohio and West Virginia Railway Company, and for no other purposes whatever.

"*Resolved*, That the remaining eight thousand bonds, amounting to $8,000,000, shall be sold and disposed of by the president and executive committee, and the proceeds thereof shall be applied for the purpose of double-tracking, equipping and increasing the transportation facilities of and improving the company's railway, and in purchasing such real estate and other property as in the judgment of its board of directors, or of the president and executive committee, the interests of said company require."

It is upon the language of this resolution that the learned counsel for the plaintiff rely to establish their contention that the bonds in question were to be used for the purpose of increasing the value of the property mortgaged, or the purchase of other property of such a character as to come under the lien of the mortgage as soon as acquired. The instrument contained the usual covenants that when the railway acquired any franchises or other property the same should be held upon the trust and subject to the lien of the same, but from this provision " stocks, notes or bonds of other companies, for the use of or in connection with its railroad " were excepted.

There is no dispute in regard to the important fact which appears in the findings, that the eight thousand bonds were delivered by the railway company to Burke in exchange for all the stock of the coal company, amounting to fifteen thousand shares, which at par would amount to only one million five hundred thousand dollars, but which, as the plaintiff claims, was worth less than half that sum. The defendant, however, insists that the property thus acquired was of great value, and there is a finding in the case to the effect that the profits of the railway company, in the year 1891, from this coal property, amounted to a large sum of money, more than sufficient to pay the interest on the bonds exchanged for it. But whatever the value of the stock may be, it is all that the railway company ever got for the bonds, and it still holds and owns it. The bonds were thus delivered to the defendant

under a resolution of the board of directors of the railway, subsequently ratified, which he and his associates, being in absolute control, were enabled to pass, and, owning all the stock of both corporations and directing all their affairs, they were thus enabled to deal with each other without fear of complaint from any stockholder. But it is evident enough that the acquisition of the coal stock was not the sole purpose for which the bonds were delivered to the defendant. At most only a million and a half was necessary for that purpose, and they were in fact used also for the purpose of paying notes, amounting to six million dollars, which the defendant and his associates had given to the bankers referred to in order to raise money with which to purchase all the stock in the three divisional companies, absorbed in the consolidation, the possession and ownership of which was a vital part of the whole scheme. This stock when purchased by them was exchanged for the new stock of the consolidated road which they received as their own property and subsequently sold as their own. The remainder of the proceeds of the bonds was used to pay commissions to the bankers, to pay for services to various persons who aided in the promotion of the project and for some other purposes not important to state. It is sufficient to say that all the proceeds of the bonds went to the personal use of the defendant and his associates and the payment of their debts except so far as necessary to acquire the stock of the coal company.

This was contemplated from the very beginning, and they had in fact, long before the bonds were issued, contracted with the bankers to deliver them for this purpose when issued, and in so disposing of the bonds they were but carrying out arrangements into which they had entered long before, and which were necessary to the accomplishment of the end in view.

The general attitude of the plaintiff is that he, as the champion and representative of all the bondholders, in default of the trustee whose duty it was to act, has the right to reclaim the fund so improperly diverted and compel the railway com-

pany to apply it to the purpose to which it was originally devoted.

The true character of all the transactions in which the defendant and his associates were engaged, and their conduct, in law and in morals, cannot be fairly judged without always keeping clearly in mind their real relations to the property with which they were dealing, and to the two corporations in whose names it was nominally held. They were, however, the real beneficial owners of it all, and when they had finally consummated the scheme by the various acts complained of what they had actually done amounted to this and nothing more: They had raised a vast sum of money by placing a mortgage upon their own property, and had expended and disbursed the money as they thought would best promote their own interests. There is no one who, in this action, has any right to complain of this unless the bondholders, from whom they borrowed the money, were intentionally deceived to their loss or injury for which they have no adequate redress at law.

Recurring again to the construction of the provisions of the mortgage, it is obvious that the stipulations referred to in the covenant must be gathered from all the language which precedes it and has already been referred to. The only purpose of inserting the covenant at all was to prescribe the use to which the bonds or their proceeds were to be devoted, and it is reasonable to suppose that some restriction at least was intended. For the purpose of promoting justice and guarding against or redressing injury to innocent parties a court of equity would be astute to give effect to such instruments, according to the sense in which the party executing it intended that it should be understood, and, taking all the words together and applying the principle of *ejusdem generis*, it is quite possible that a construction could be adopted in accordance with the contention of the plaintiff.

Assuming that proposition, there would still remain other questions of the gravest nature which would also have to be resolved in his favor. Perhaps the most important one is

embraced in the contention of his counsel, that upon the certification and delivery of the bonds by the trust company, the trustee, to the railroad company, they were at once impressed with a trust, lien or equity in favor of the trustee, for the benefit of the future purchasers, and that a breach of such trust, by the use of the bonds for other purposes, subjected all the parties engaged in it, whether the railway company or the defendants, or all of them, to liability to restore the proceeds obtained in violation of the trust, for the benefit of the holders of the bonds. The defendant's answer to that position is that the bonds had no inception or validity as obligations of the railway company until sold; that until then they were not property which could be the subject of a trust, and that at no time did the trustee of the mortgage have any property right or interest in them, legal or equitable; that the railway company held them with the absolute power of disposition, and when they were delivered to Burke in exchange for the stock he acquired the absolute title free from any, trust, lien or equity in favor of any one. The defendant's answer to the plaintiff's claim on the theory of breach of the covenant, as a contract, would seem to be conclusive, and that is that he never made the covenant, but that contract, whatever its effect, was the act of the railway company, and that even if it were true that he caused it to be violated, by means of his control of the corporation, it does not follow that he is liable upon it or that the plaintiff is entitled to sue for its breach in a court of equity. Finally, it is urged that the defendant and his associates are liable and bound to restore the proceeds of the bonds on the ground of fraud. There is no distinct finding of fraud in the case, but there are findings in regard to the various acts of the defendant and his associates from the inception of the scheme to its close, and from all these findings it is argued that they so managed all the several steps leading up to the execution of the mortgage and the delivery of the bonds and so framed the language of the mortgage itself as to be a deceitful word of promise to the .

ear of investors who were thereby induced to purchase the bonds.

These problems are somewhat complicated and embarrassed by the presence in the case of another question which arises from a former litigation. The defendant's answer alleges, by way of defense, and the trial court has found, that on the 10th of February, 1887, the railway company brought an action against Burke and his associates, or some of them, in the Court of Common Pleas of Franklin county, Ohio, the domicile of all the corporations, and the state in which all or most of the transactions took place; that the action so brought was based upon the same facts alleged and found in this action; that after issue joined it was, by agreement, referred to arbitrators for decision; that they heard the evidence and considered the claims of the then plaintiff which were based upon substantially the same ground as the plaintiff now claims in this action; that the award was in favor of the defendants on all the issues, and that on November 1, 1888, judgment was entered thereon in accordance with the agreement for arbitration. Neither the plaintiff nor the trust company, whose rights he represents, were parties to that action, and, of course, the action cannot be a bar, except as to such rights, if any, as the plaintiff now claims through the railway company. It may also be added that the learned counsel for the plaintiff contend that the delivery of the bonds to the defendant in exchange for the stock of the coal company was an act *ultra vires* under the laws of Ohio.

There are other and minor questions in the case, but sufficient has already been stated to show that the plaintiff's road to success in the action is beset with many difficulties. The questions are of such a character that it may reasonably be asserted that a court of equity would have some hesitation in resolving them in the plaintiff's favor, unless, possibly, in the presence of some great wrong or injury that called for redress or prevention.

The position of the parties is sought to be maintained on the one side and resisted on the other by elaborate argument.

evidently the result of great industry and learning, by abundant citation of authorities, which we deem it unnecessary now to quote, and with much subtle and ingenious reasoning. If we were now to enter upon the discussion and decision of these questions, it would be fortunate, indeed, if we could reach any conclusion that would be satisfactory to ourselves, without, at the same time, imperiling in some way the enormous financial interests based upon the security of railway bonds, which, although not within the immediate and direct scope of this litigation, might be affected by its results.

In the view that we are disposed to take of this case, the decision of these important and complex questions will not be necessary, so we leave them for some occasion when their determination becomes necessary, and they have been referred to now, only, for the purpose of making plain the point upon which we think that our judgment can safely rest.

The nature of the questions upon which the plaintiff's case depends, the sweeping relief which is given to him by the scope of the decision under review, and the momentous consequences to the defendant which must follow that decision if sustained, naturally directs the mind at once to an examination of the record for the purpose of finding some serious wrong or injury committed, threatened or reasonably probable, for the redress or prevention of which the plaintiff is entitled to appeal to the powers of a court of equity. It is needless to say that the case is entirely barren of any such feature. There is no allegation, proof or finding on that subject, but, on the contrary, it not only appears that he has not suffered any actual loss, but that, when he purchased the bonds at less than eighty cents, he made a good bargain and secured a prudent investment, the fruits of which he has ever since enjoyed and still retains. The interest has been promptly paid as it became due, the bonds have materially appreciated in value in the market, and there has not been a time since he made the purchase that he could not have sold them at a handsome profit. When we bear in mind the fact that those securities have passed through a period of great financial depression and

disaster without default in the payment of interest, or depreciation in the market price, the transaction was rather creditable to his financial judgment than otherwise.

We have seen that these bonds were a part of a large block of six millions which were purchased by Winslow, Lanier & Co., the bankers, at the time they were issued, and it appears in the case that another million and a half were subscribed for at par by parties perfectly responsible and before any mortgage was made. The bankers purchased them with full knowledge of all the facts. They had knowledge of and were intimately connected with all the transactions that resulted in the issue and delivery of them to the defendent for the coal company stock. They knew perfectly well that it never was the intention to use them or the proceeds for the purpose that the plaintiff insists they should have been applied, and they were aware of all the steps in the scheme of the defendant and his associates as well as the end and aim in view. Of course these purchasers could not have been and were not defrauded or injured in any way, and it is conceded on all sides that they could not have maintained this action, and hence the plaintiff cannot unless he stands in a better position. We think that upon the findings in the case the same knowledge may be fairly imputed to him. Before acquiring the bonds he made full inquiry in regard to the condition of the property, their safety as an investment and the security for their payment. It is found that he was not aware of this particular covenant in the mortgage, and that he did not rely or act upon it, and that he did know substantially what the actual situation was and how the bonds or their proceeds had been used. It appears that he availed himself of every source of information on this subject that was open to a careful and prudent man. He made inquiry of the defendant Burke and was informed by him that the whole issue had been sold; that the railway company had parted with them, and that they were all then in circulation upon the market. He consulted Poor's Manual, a publication intended to furnish needful information on this subject to investors, and which

contained the general balance sheet of the company. From that he learned that the eight thousand bonds had been sold ; that interest had been paid upon them in the year 1882 ; that the company had as part of its assets over eight millions in stocks and bonds and but a comparatively small balance in cash. This was notice to the plaintiff that the bonds had not been used to increase the security of the mortgage lien, and furnished to his mind the reasonable inference as to what the real fact was, namely, that they had been exchanged for the very large and nearly corresponding amount of assets on hand represented by stocks or bonds. With these findings in the case it is impossible to say that the plaintiff was deceived or defrauded to his injury, and even if it was true, that the conduct of the defendant and his associates was questionable from the standpoint of strict commercial honor and business integrity, yet, it did not result in any injury to the plaintiff, the trustee or any of the bondholders. It is quite true that he is a *bona fide* holder of his bonds in the sense in which that term is applied to negotiable obligations for the payment of money, but it does not follow that this position entitles him to invoke the jurisdiction of equity to interfere in or set aside transactions that were entered into long before he had any interest in the bonds, to which he was not a party, and that had the consent and acquiescence of the then owners of all the bonds, and of the railway company whose obligations they were, and which have not resulted in any actual injury to him. So far as he is concerned these transactions are *res inter alios acta*. The contention that the plaintiff is entitled to the benefit of the security nominated in the mortgage, though he has not yet been injured, in order to protect him from the chances of future loss and to give to his bonds the value in the market which the restoration of the diverted fund would necessarily produce, is not, we think, entitled to much weight. One answer to it is, that a person cannot buy depreciated bonds in the market, with knowledge of all the facts, and then proceed to increase the value by attacking, in a court of equity, business transactions which took place years before he had any

interest in them, whereby some portion of the security promised
in the mortgage was diverted, released or waived by the action
and with the consent of every party who then had any interest
either in the bonds or the property. Having acquired the
bonds with knowledge of all the facts, he must, in equity, be
deemed to have acted upon and acquiesced in the condition of
the security as he found it. Moreover, it is altogether uncer-
tain whether the plaintiff's success in this action could
accomplish the desired result. If the defendant should be
adjudged to pay this vast sum into the treasury of the railway
company, who would then own or have the benefit of
the money? The stockholders certainly have no right to
it, since they acquired their stock subsequent and subject
to the mortgage, and yet it is difficult to see who else could be
benefited. It may be said that the court would direct the
railway company to use it for the purpose held out in the
mortgage to the purchasers of the bonds and to feed the
security, but that might be a waste of the money. To
double-track a railroad or to add terminals does not necessarily
increase its earning capacity, and, therefore, does not neces-
sarily increase its value. Whether, in this case, such an appli-
cation of the money would or would not add to the value of
the security would depend upon circumstances. If the rail-
way is now in every way equipped for the transaction of all
the business that naturally belongs to it, then the use upon it
of this large sum of money might not materially increase its
revenues and might add to its expense. There is no allegation
or finding in the case that this railway now needs anything in the
way of construction in order to enable it to transact all of its busi-
ness. If the money is put into the treasury, to await the matu-
rity of the bonds, it would still be the money of the railway, and,
unless the courts keep watch and guard over it, or supervise
its use or expenditure, it must be subject to the control of the
directors. But we know that directors are made and unmade
by stockholders, and the latter could always be relied upon to
elect such as would best promote their own interests. The
difficulty of formulating any judgment in the case which, on

any state of the facts, would conform to equity might be further illustrated by another fact which is asserted in the case. It is stated upon the defendants' brief that Winslow, Lanier & Co., or the other bankers, still own three thousand two hundred and fourteen of these bonds. This assertion does not seem to be disputed, though I have failed to notice the fact among the findings. It is, of course, quite possible, since they could purchase them at any time in the market, if they have not retained them under the original transaction, and so may Burke and his associates. But, upon the theory of this action, they were all original wrongdoers who conceived and perpetrated the fraud from beginning to end, and, of course, could have no standing in a court of equity to question any of the transactions, and yet it is difficult to see how they can be debarred from sharing in the fruits of the plaintiff's success in this action and thus becoming beneficiaries of their own wrong.

If the market value of the plaintiff's bonds would be increased by compelling the defendants to account for the money received upon the sale of the bonds, that increase would inure to the benefit of every other holder as well. It would be found impossible to discriminate between the innocent and the guilty. There is no aspect of the case that presents any element of equity that would justify the application of the principles stated with so much clearness and force by counsel. So, we think, it can and should be disposed of upon a few plain propositions in regard to which we are all in accord.

The plaintiff did not act upon the faith of any statement in the mortgage, but upon his own judgment, after full inquiry, with knowledge of the exact situation, and, hence, he was not deceived. He sustained no loss by the transaction, but, on the contrary, made a considerable sum of money. There is nothing in the case that gives any reasonable warrant for supposing that he ever will sustain any loss. This leaves him without any just ground of complaint and without any right to maintain this action.

We do not mean to intimate that even a bondholder, more favorably situated than the plaintiff is, could maintain it without showing some actual loss sustained, or probable danger of loss in the future. In any case the lapse of time and long acquiescence in the situation, would furnish good ground for the refusal of a court of equity to review transactions of this character between prior owners of such bonds and the railway, which had the assent of every party in interest. (*Calhoun* v. *Millard*, 121 N. Y. 69.) Nor are we inclined to concur in the legal conclusion upon which the case was disposed of at the Special Term, that plaintiff's rights as a bondholder are derived through and under the original takers, and that he can have no other rights, under any circumstances, except such as they could assert. The plaintiff is one of the future bondholders named in the mortgage, with whom the contract was made, and one of the beneficiaries under that instrument, and must, for all the purposes of this question, be deemed to be a purchaser of the bonds as of the time when the railway company made the agreement under which they were issued and their payment secured. His rights are not affected by the mere fact that the title to his bonds can be traced back to parties who participated and were actors in the several transactions that took place prior to December, 1881, but if, under any circumstances, he could maintain this action, that right is materially affected by the equities existing to his knowledge when he purchased the bonds, and the further fact that he is in a court of equity without any solid ground for a claim of actual or prospective loss or injury. It is the absence of any commanding equity in his favor, not any inherent infirmity that attached to the bonds themselves, that constitutes the conclusive answer to this action, whatever may be its technical character, whether grounded upon fraud, breach of trust or breach of covenant.

The judgment of the General Term should be reversed and that of the Special Term affirmed, with costs.

All concur in result upon the ground of the plaintiff's relation to the litigation, but witholding all expression of opinion

upon the question whether, in the absence of notice to the plaintiff of the facts when he purchased the bonds, the action could or could not be maintained.

The court agreed upon the proposition that subsequent holders of bonds in good faith and without notice are not precluded from relief on the ground that Winslow, Lanier & Co. took the bonds with notice of the actual transaction.

FINCH and HAIGHT, JJ., concur with opinion.

Judgment accordingly.